**NTCAPR**

# U.S. Bankruptcy Court
# Northern District of Indiana (Hammond Division)
# Adversary Proceeding #: 11−02151−jpk

*Assigned to:* J. Philip Klingeberger                    *Date Filed:* 10/05/11
*Lead BK Case:* 07−20188
*Lead BK Title:* Heartland Memorial Hospital, LLC and Robert Handler
*Lead BK Chapter:* 11
*Demand:* $50000
  *Nature[s] of Suit:*   02 Other (e.g. other actions that would have been brought in state court if unrelated to
                              bankruptcy)

### *Plaintiff*
─────────────────────────
**David Abrams, not individually but solely as the Liquidating Trustee and court −appointed manager of Heartla**

### *Plaintiff*
─────────────────────────
**Heartland Memorial Hospital LLC,** *LLC, the Debtor, an Indiana Limited Liability Company*

V.

### *Defendant*
─────────────────────────
**McGuire Woods, LLP**
77 W. Wacker Drive
Suite 4100
Chicago, IL 60601

| Filing Date | # | Docket Text |
|---|---|---|
| 10/05/2011 | 1 | Adversary case 11−02151. (02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))) Complaint by David Abrams, not individually but solely as the Liquidating Trustee and court −appointed manager of Heartland Memorial Hospital, LLC, Heartland Memorial Hospital LLC against McGuire Woods, LLP. Fee Amount $250. (Leipold, Mark) (Entered: 10/05/2011) |
| 10/05/2011 | 2 | Summons Issued on McGuire Woods, LLP Answer Due 11/4/2011 Summon Issued (Leipold, Mark).  Page 2 (Certificate of Service). (Entered: 10/05/2011) |
| 10/05/2011 |  | Receipt of Complaint(11−02151−jpk) [cmp,cmp] ( 250.00) filing fee. Receipt Number 10199177, amount $ 250.00. (U.S. Treasury) (Entered: 10/05/2011) |
| 10/06/2011 | 3 | Certificate of Service Filed by Plaintiffs David Abrams, not individually but solely as the Liquidating Trustee and court −appointed manager of Heartland Memorial Hospital, LLC, Heartland Memorial Hospital LLC (related document(s)1 Complaint filed by David Abrams, not individually but solely as the Liquidating Trustee and court −appointed manager of Heartland Memorial Hospital, LLC, Heartland Memorial Hospital LLC) (Leipold, Mark) (Entered: 10/06/2011) |
| 10/17/2011 | 4 | Certificate of Service of Summons on McGuire Woods, LLP 10/17/2011 . (Leipold, Mark) (Entered: 10/17/2011) |
| 11/04/2011 | 5 | Notice of Agreed Initial Enlargement of Time to respond to Plaintiff's Complaint Filed by Defendant McGuire Woods, LLP (related document(s)1 Complaint filed by David Abrams, not individually but solely as the Liquidating Trustee and court −appointed manager of Heartland Memorial Hospital, LLC, Heartland Memorial Hospital LLC) (Giles, David) Modified on 11/6/2011 (dlz). (Entered: 11/04/2011) |
| 12/05/2011 | 6 | Motion for Withdrawal of Reference . Fee Amount $176 Filed by Defendant McGuire Woods, LLP (Giles, David) (Entered: 12/05/2011) |
| 12/05/2011 |  | Receipt of Motion for Withdrawal of Reference(11−02151−jpk) [motion,mwdrefad] ( 176.00) filing fee. Receipt Number 10399832, amount $ 176.00. (U.S. Treasury) (Entered: 12/05/2011) |
| 12/05/2011 | 7 | Memorandum In Support of McGuireWoods LLP's Motion to Withdraw Reference Filed by Defendant McGuire Woods, LLP (related document(s)6 Motion for Withdrawal of Reference filed by McGuire Woods, LLP) (Giles, David) Modified on 12/7/2011 (dlz). (Entered: 12/05/2011) |
| 12/05/2011 | 8 | Motion To Stay or Alternatively to Extend Time Filed by Defendant McGuire Woods, LLP (Giles, David) Modified on 12/7/2011 (dlz). (Entered: 12/05/2011) |
| 12/05/2011 | 9 | Notice of Appearance Filed by Defendant McGuire Woods, LLP (Giles, David) (Entered: 12/05/2011) |

| 12/27/2011 | | <u>10</u> | Order Regarding McGuirewoods LLP's Motion to Stay or Alternatively to Extend Time (Related Doc # <u>8</u>) (jas) (Entered: 12/27/2011) |
|---|---|---|---|
| 12/27/2011 | | <u>11</u> | Notice of Appearance *of Christopher J. Horvay* Filed by Plaintiff David Abrams, not individually but solely as the Liquidating Trustee and court −appointed manager of Heartland Memorial Hospital, LLC (Horvay, Christopher) <span style="color:red">Modified on 12/28/2011</span> (jas). (Entered: 12/27/2011) |
| 12/27/2011 | | <u>12</u> | Response to Motion for Withdrawal of Reference Filed by Plaintiff David Abrams, not individually but solely as the Liquidating Trustee and court −appointed manager of Heartland Memorial Hospital, LLC (related document(s)<u>6</u> Motion for Withdrawal of Reference filed by McGuire Woods, LLP) (Horvay, Christopher) (Entered: 12/27/2011) |
| 12/31/2011 | | <u>13</u> | Reply Motion for Withdrawal of Reference Filed by Defendant McGuire Woods, LLP (related document(s)<u>6</u> Motion for Withdrawal of Reference filed by McGuire Woods, LLP) (Giles, David) (Entered: 12/31/2011) |
| 01/12/2012 | | <u>14</u> | Notice of Transmittal to U.S. District Court (related document(s)<u>6</u> Motion for Withdrawal of Reference filed by Defendant McGuire Woods, LLP). (Stewart, Michael) (Entered: 01/12/2012) |

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| HEARTLAND MEMORIAL HOSPITAL, | ) | Case No. 07-20188-JPK |
| LLC, an Indiana limited liability company | ) | Chapter 11 |
| | ) | |
| Debtor, | ) | Hon. J. Philip Klingeberger |
| | ) | |
| | ) | |
| DAVID ABRAMS, not individually but solely | ) | |
| as the Liquidating Trustee and court-appointed | ) | |
| manager of HEARTLAND MEMORIAL | ) | |
| HOSPITAL, LLC, and HEARTLAND | ) | |
| MEMORIAL HOSPITAL, LLC, the Debtor, | ) | |
| an  Indiana limited liability company, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. No. 11-02151-JPK |
| | ) | |
| v. | ) | |
| | ) | |
| McGUIREWOODS LLP, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>McGUIREWOODS LLP'S MOTION TO WITHDRAW THE REFERENCE</u>

McGuireWoods LLP moves the district court under 28 U.S.C. § 157(d), Federal Rule of

Bankruptcy Procedure 5011(a), and Northern District of Indiana Local Rule 200.1(d) for an

order withdrawing the reference of this adversary proceeding from the bankruptcy court to the

district court.

1.      For the reasons given in McGuireWoods's accompanying memorandum of law

(which is incorporated by reference into this motion), the district court should withdraw the

reference of this adversary proceeding to the bankruptcy court.  Among other things:

- The adversary complaint contains a one-count claim for common-law legal
malpractice under state law.

- There is a right to a jury trial on this one count claim for malpractice.

- The only proper plaintiff in the adversary complaint, Heartland Memorial Hospital LLC, has filed a jury demand, so *it*—not McGuireWoods—was required under Local Rule 200.1(c)(2)(A) to move to withdraw the reference at the moment that it filed its demand.

- The claim is "non-core;" it arises solely under state law and was filed long after Heartland's Chapter 11 plan was confirmed by the bankruptcy court.

- The claim is not by a debtor with a bankruptcy estate. The claim is by only a former—and now reorganized—debtor.

- The claim is not against a creditor or other party involved in an actively administered bankruptcy case.

- McGuireWoods was never a party to Heartland's actively administered bankruptcy case.

- No substantive activity has taken place in this adversary proceeding (other than the filing of the adversary complaint).

- The bankruptcy court has no special familiarity with the law or facts underlying the case.

For all these reasons, there is no reason to maintain the reference of the adversary complaint to the bankruptcy court.

2. Other than Heartland's status as a former debtor in the bankruptcy court and the fact that Heartland's Chapter 11 plan required it to initiate this proceeding in the bankruptcy court, there is no connection between the claims in this case and the bankruptcy court and no reason for this case to continue in the bankruptcy court.

WHEREFORE, McGuireWoods respectfully requests that the district court enter an order (i) withdrawing the reference of this adversary proceeding and directing that the case proceed in the district court and (ii) granting McGuireWoods a reasonable period of 28 days from the date of ruling on this motion to respond to the adversary complaint.

Dated:  December 5, 2011

Respectfully submitted,

/s/ David C. Giles

David C. Giles
SCHIFF HARDIN LLP
233 S. Wacker Drive
Chicago, IL  60606
(312) 258-5819

*Counsel for Defendant
McGuireWoods, LLP*

## CERTIFICATE OF SERVICE

I, David Giles, certify that on December 5, 2011, I filed the foregoing using the ECF system, which will send notification of such filing to the following registered parties and constitutes service upon them:

| | | |
|---|---|---|
| Christopher J. Horvay | Eugene Schiltz | Shawn D. Cox |
| Mark E. Leipold | Sean B. Crotty | Gordon E. Gouveia |
| Gould & Ratner LLP | Elizabeth E. Richert | Gouveia & Associates |
| 222 North LaSalle Street, | Coleman Law Firm | 433 West 84th Drive |
| Suite 800 | 77 West Wacker Drive, | Merrillville, IN 46410 |
| Chicago, IL 60601 | Suite 4800 | |
| | Chicago, IL 60601 | |

/s/ David C. Giles

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| HEARTLAND MEMORIAL HOSPITAL, | ) | Case No. 07-20188-JPK |
| LLC, an Indiana limited liability company | ) | Chapter 11 |
| | ) | |
| Debtor, | ) | Hon. J. Philip Klingeberger |
| | ) | |
| | ) | |
| DAVID ABRAMS, not individually but solely | ) | |
| as the Liquidating Trustee and court-appointed | ) | |
| manager of HEARTLAND MEMORIAL | ) | |
| HOSPITAL, LLC, and HEARTLAND | ) | |
| MEMORIAL HOSPITAL, LLC, the Debtor, | ) | |
| an Indiana limited liability company, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. No. 11-02151-JPK |
| | ) | |
| v. | ) | |
| | ) | |
| McGUIREWOODS LLP, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF McGUIREWOODS LLP'S**
**MOTIOIN TO WITHDRAW THE REFERENCE**

The district court should withdraw the reference to the bankruptcy court of this adversary

proceeding commenced against McGuireWoods LLP by Heartland Memorial Hospital LLC.  *See*

28 U.S.C. § 157(d); Fed. R. Bankr. P. 5011(a); N. D. Ind. L.R. 200.1(d).  The adversary

complaint contains a one-count claim for common-law legal malpractice under state law.  There

is a right to a jury trial on this claim, and Heartland has in fact filed a jury demand.  The claim is

"non-core;" it arises solely under state law and was filed long after Heartland's Chapter 11 plan

was confirmed by the bankruptcy court.  So the claim is not by a debtor with a bankruptcy estate.

The claim is by only a former—and now reorganized—debtor.  Nor is the claim against a

creditor or other party involved in an actively administered bankruptcy case. McGuireWoods was never a party to Heartland's bankruptcy case. Finally, no substantive activity has taken place in this adversary proceeding (other than the filing of the adversary complaint). The bankruptcy court accordingly has no special familiarity with the law or facts underlying the case. For all these reasons, there is no reason to maintain the reference of the adversary complaint to the bankruptcy court. In fact, as explained below, it was Heartland and not McGuireWoods that initially should have sought the relief requested in this motion by moving to withdraw the reference when it included a jury demand with its adversary complaint.

## BACKGROUND

### A. The Post-Bankruptcy State-Law Claim Against McGuireWoods

The legal-malpractice claim in this adversary proceeding was first asserted in a state-court complaint filed on March 3, 2009. (Mar. 3, 2009 Complaint, attached as Exhibit 1. All of the exhibits to this brief are publicly filed records that can be judicially noticed. *E.g.*, *McCann v. Neilsen*, 466 F.3d 619, 620 n.1 (7th Cir. 2006).) The state-court complaint included claims against McGuireWoods and two other sets of lawyers and law firms that allegedly represented Heartland in 2005 and 2006: DLA Piper LLP as well as Harold Collins, his son Michael Collins, and their firm, Collins & Collins. (Ex. 1, *passim*.) The state-court complaint's theory is that each set of lawyers committed malpractice by breaching an alleged state-law duty of "loyalty" to safeguard Heartland's assets from its parent company and its parent's shareholders. (*Id.* ¶¶ 79, 88, 95, 102(A).) The claim—which is hopelessly flawed—is that the lawyers (who actually represented different parties in a series of deals with McGuireWoods representing Heartland's parent in just one deal) somehow acted "adversely" to Heartland by failing to stop Heartland's management from selling and leasing back Heartland's assets in order to raise cash for itself, its parent, and its parent's shareholders. (*Id.*) The principal of several problems with this claim is

that Heartland was a wholly owned subsidiary.  So not even Heartland's management—much less its outside lawyers—owed it any independent duties of "loyalty" separate from those owed to its parent or the parent's shareholders.  As a wholly owned subsidiary, Heartland at all times existed for its parent's sole benefit as a matter of settled corporate law.  *E.g.*, *Deleo v. Swirsky*, No. 00 C 6917, 2001 WL 687458, at *8 (N.D. Ill. Jun. 19, 2001); *Anadarko Petro. Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988).

The state-court complaint was filed after Heartland had emerged from a Chapter 11 bankruptcy case in the U.S. Bankruptcy Court for the Northern District of Indiana.  (*See In re Heartland Mem'l Hosp., LLC*, No. 07-20188-JPK (Bankr. N. D. Ind. Jan. 31, 2007), Dkt. 1, 2010.)  Long after the complained of transaction involving McGuireWoods, Heartland's creditors in January 2007 filed an involuntary complaint against it in the bankruptcy court, and in November 2008 the bankruptcy court confirmed its Chapter 11 plan of reorganization.  (*Id.*, Dkt. 1, 1887-1, 2010.)  Under the plan Heartland established a liquidating trust, appointed David Abrams as the "Liquidating Trustee" for the trust, and tasked the Liquidating Trustee with liquidating Heartland's principal assets, which Heartland had transferred to the trust.  (*Id.*, Dkt. 1887-1, §§ 1.58, 3.1, 6.2, and Dkt. 1938, § 7.1.)  Those assets included Heartland's litigation claims—except for claims against attorneys for which an assignment to the trust might violate state law.  (*Id.*, Dkt. 1887-1 § 3.1 ("The Plan proponents believe, for example, that certain malpractice claims against attorneys cannot be transferred to the Liquidating Trust.  These assets will remain with the Reorganized Debtor [*i.e.* Heartland following confirmation of the Chapter 11 plan].").

Almost five months after the plan's confirmation, the Liquidating Trustee filed Heartland's state-law legal-malpractice claims against McGuireWoods, DLA Piper, and the

Collins defendants in Illinois state court, as well as a series of adversary proceedings in the bankruptcy court to recover for alleged preferential transfers and other claims under the Bankruptcy Code. The Liquidating Trustee brought these adversary proceedings against Heartland's former management as well as some of its alleged former lawyers—including DLA Piper and the Collins defendants. (*Abrams v. DLA Piper*, Adv. No. 02049-jpk (Bankr. N.D. Ind. Feb. 26, 2009), Dkt. 1 & 3, Amend. Compl. (asserting claims under §§ 502, 547, 548, and 550 of the Bankruptcy Code); *Abrams v. Collins*, Adv. No. 09-02068 (Feb. 29, 2009), Dkt. 1 (asserting claims under §§ 547, 548, and 550 of the Bankruptcy Code).) But no case was filed in bankruptcy court against McGuireWoods. Nor had McGuireWoods participated to that point in any way in Heartland's bankruptcy case.

> **B.     Dismissal of The State-Court Complaint**

On March 2, 2010 the Illinois state court dismissed the state-law malpractice complaint against McGuireWoods, DLA Piper, and the Collins defendants. The court gave two grounds for its decision: (i) the complaint had to be filed in the first instance in the bankruptcy court under Section 9.13 of Heartland's Chapter 11 plan and (ii) Heartland itself and not the Liquidating Trustee was the only proper plaintiff because Heartland had retained all malpractice claims in Section 3.1 of the plan. (Mar. 2, 2010 Tr at 6:9-24 & Order, attached as Exhibits 2 and 3.) The Liquidating Trustee moved to reconsider the first ruling (and sought leave to amend to try to resolve the second), and at the same time asked the bankruptcy court to "interpret" Section 9.13 of the Chapter 11 plan. (*In re Heartland*, No. 07-20188-JPK, Dkt. 2181.) The bankruptcy court did so in a decision issued on June 9, 2011, concluding that (i) the state court had correctly interpreted Section 9.13 of the plan and (ii) Section 9.13 as originally written was impermissibly broad and had to be amended. (*Id.* Dkt. 2230.) The bankruptcy court was not presented with—

and did not purport to address—any issue bearing on the substance of Heartland's state-court complaint.

The Liquidating Trustee presented the bankruptcy court's order to the state court, but after further briefing and a hearing held on October 5, 2011, the state-court judge declined to reconsider his ruling dismissing the complaint.  (Oct. 5, 2011 Order, attached as Exhibit 4.)  That same day, Heartland and the Liquidating Trustee filed this adversary proceeding against McGuireWoods, asserting verbatim the same complaint and state-law claim that it had filed in Illinois state court.  The adversary complaint differs from its state-court predecessor only in that Heartland removed the counts against DLA Piper and the Collins defendants, having elected instead to try to import those counts against those defendants into the preference adversary proceedings pending against them since 2009.  (*Abrams v. DLA Piper*, Adv. No. 02049-jpk, Dkt. 48; *Abrams v. Collins*, Adv. No. 09-02068, Dkt. 201.)

Heartland asserts in its adversary complaint against McGuireWoods that it continues to "disagree" with the state court's ruling, which it is now appealing.  Heartland says in its complaint that "these claims have been filed in this Court at this time to preserve the position that the statute of limitations is tolled because of their pendency."  (*Heartland v. McGuireWoods LLP*, Adv. No. 11-02151-jpk (Bankr. N.D. Ind. Oct. 5, 2011), Dkt. 1, Adv. Compl. ¶ 4, attached as Exhibit 5.)

## ARGUMENT

Under 28 U.S.C. § 1334 federal district courts have original jurisdiction over all bankruptcy matters.  Matters within that jurisdiction are "referred" automatically to the bankruptcy court for each federal judicial district, including the U.S. Bankruptcy Court for the Northern District of Indiana, *e.g.*, N.D. Ind. L.R. 200.1, and this reference can and should be "withdrawn" in any case "for cause shown."  28 U.S.C. § 157(d).  "Cause" can exist under at

least five circumstances:  (i) the "parties have demanded a jury trial," (ii) a "non-core proceeding

is involved," (iii) "withdrawal would promote judicial economy or uniformity and efficiency in

bankruptcy administration" and "reduce forum shopping," (iv) the bankruptcy court has no

superior "familiarity with the case," and (v) withdrawal would not "cause delay and costs to the

parties."  *Means v. Ameriquest Mortg. Co.*, 2:06-CV-409-TS, 2009 WL 4427696, at *4 (N.D.

Ind. Nov. 24, 2009).  Here *all* of these circumstances exist.  Possibly no complaint could serve as

a better candidate for withdrawal than this case's state-law adversary complaint, which concerns

only conduct that allegedly occurred before Heartland's bankruptcy case and was filed long after

that case effectively concluded with the confirmation of Heartland's Chapter 11 plan[*]

### I.   THIS CASE INVOLVES A JURY DEMAND.

Bankruptcy courts in the Seventh Circuit cannot hold jury trials.  *Matter of Grabill Corp.,*

967 F.2d 1152, 1156 (7th Cir. 1992).  Consequently, "the right to a jury trial is sufficient cause to

withdraw the reference to the bankruptcy court" even if all parties consent to proceed in the

bankruptcy court (which they do not here)  *Means*, 2009 WL 4427696, at *4; *Wellman Thermal*

*Sys. Corp. v. Columbia Cas. Co.*, 105CV-01191-JDT-TAB, 2005 WL 4880619, at *3 (S.D. Ind.

Oct. 5, 2005); *Good v. Kvaerner U.S., Inc.*, 1:03-CV-0476 SEB-VSS, 2003 WL 21755782, at *3

(S.D. Ind. July 25, 2003); *Consol. Indus. Corp. v. Welbilt Holding Co.*, 254 B.R. 237, 238-39 &

n.5 (N.D. Ind. 2000) ("If the defendants are entitled to a jury trial, cause exists to withdraw the

reference, because the bankruptcy court is not able to provide them with the jury trial they have

requested.").  So fundamental is this principle that there is a local rule in this district on the

---

[*]  In addition to showing these five circumstances, a request to withdraw the reference
must be "timely."  McGuireWoods's motion meets that standard because it represents
McGuireWoods's first substantive filing in this adversary proceeding, coming before even a
responsive pleading to the adversary complaint.  *E.g.*, *Vista Metals Corp. v. Metal Brokers Int'l
Inc.*, 161 B.R. 454, 457 (E.D. Wis. 1993) (withdrawal request "timely" if brought with the first
responsive pleading or "shortly thereafter").

subject.  Parties who demand a jury trial in a case pending in the bankruptcy court *are required* when making their jury demand to move *simultaneously* to withdraw the reference.  N.D. Ind. L.R. 200.1(c)(2)(A).

Here there is no dispute that a claim for legal malpractice is a state common-law claim for which there is a right to a jury trial under the Seventh Amendment.  *E.g.*, *Goodman v. Levy*, 06 C 5526, 2007 WL 641562 (N.D. Ill. Feb. 28, 2007).  Indeed, Heartland's adversary complaint contains a demand for a jury trial, so under Local Rule 200.1(c)(2)(A), *it* should have moved to withdraw the reference when it filed that demand at the risk of waiving the demand.  *Consol. Indus.*, 254 B.R. at 240-41.  And although Heartland failed to discharge that obligation, McGuireWoods of course retains the right to demand a jury until at least 14 days after it files any answer to the adversary complaint, which has yet to come due.  Fed. R. Civ. P. 38(b)(1); Fed. R. Bankr. P. 9015(a); N.D. Ind. L.R. Bankr. P. B-7038-1.  That this case involves a single claim on which there undisputedly is a right to a jury trial by itself justifies withdrawing the reference.

## II.    STATE-LAW CLAIMS FOR LEGAL MALPRACTICE ARE "NON-CORE."

Beyond the right to a jury trial, "whether the proceeding is core or noncore is the most important factor when deciding whether to withdraw the reference."  *Wellman*, 2005 WL 4880619, at *3; *In re Comdisco Ventures, Inc.*, 04 C 2007, 2004 WL 1375353, at *2 (N.D. Ill. June 18, 2004).  There is no dispute that a state-law claim for legal malpractice is "non-core."  *Diamond Mortg. Corp. of Illinois v. Sugar*, 913 F.2d 1233, 1238-39 (7th Cir. 1990).  Heartland admits as much in its adversary complaint.  (*Heartland v. McGuireWoods*, Adv. No. 11-02151-jpk, Dkt. 1, Adv. Compl. ¶ 10.)  In fact, the bankruptcy court in ruling on the Liquidating Trustee's motion to "interpret" the plan specifically held that the claim against McGuireWoods

asserted first in the state court and now in the adversary complaint is "non-core." (*In re Heartland*, No. 07-20188-JPK, Dkt. 2230 at 4-5 n.4.)

McGuireWoods had no involvement in Heartland's bankruptcy case. No preference claims (which also are "non-core") or any other claims are asserted in the adversary complaint that even arguably relate to the Bankruptcy Code. The events giving rise to the alleged state-law malpractice claim against McGuireWoods all occurred years before Heartland was involuntarily placed into bankruptcy proceedings. And Heartland brought its state-court and now its adversary complaint after its Chapter 11 plan was confirmed—a fact that several courts in the Seventh Circuit have concluded further removes a case from the "core" of matters that bankruptcy courts have the power to hear. *In re Commercial Loan Corp.*, 363 B.R. 559, 565-66 (Bankr. N.D. Ill. 2007); *In re Federalpha Steel LLC*, 341 B.R. 872, 880-82 (Bankr. N.D. Ill. 2006). These facts are also independent grounds for withdrawing the reference.

### III. CONSIDERATIONS OF EFFICIENCY AND AVOIDING FORUM SHOPPING SUPPORT WITHDRAWING THE REFERENCE.

Because the adversary complaint presents only a non-core state law claim, the bankruptcy court's specialized knowledge and expertise in the Bankruptcy Code and issues common to bankruptcy cases is not required to decide Heartland's claim. Nor does the claim affect an existing bankruptcy estate under the administration of a trustee or debtor in possession, since Heartland's Chapter 11 plan was confirmed years ago. *In re United Operating, LLC*, 540 F.3d 351, 355 (5th Cir. 2008) ("Upon confirmation of the plan, the estate ceased to exist, and Dynasty lost its status as a debtor 'in possession.'"). Adjudicating the claim in the district court accordingly will not reduce the efficiency of the bankruptcy process or promote forum shopping. *Wellman*, 2005 WL 4880619, at *3 ("Withdrawal of the reference here will neither negatively

affect the uniformity and efficiency in bankruptcy administration nor promote forum shopping because the issues presented by the adversary proceeding are not unique to bankruptcy law.").

If anything, withdrawing the reference at this time will have the opposite effect. It will promote efficiency. In addition to having to become familiar with the claims in this case for purposes of trial, the district court will have plenary review over all findings of fact or conclusions of law that the bankruptcy court might enter in a case like this one where the claim is non-core and there is no consent to entry of a judgment in the bankruptcy court. 28 U.S.C. § 157(c)(1). That fact inevitably will produce wasted effort. As the court explained in *Wellman*:

> Certain efficiencies would be lost were the bankruptcy court to proceed with pretrial matters; the district court would not gain a valuable familiarity with the case that could assist it leading up to and through trial. Though the bankruptcy court could issue proposed findings of fact and conclusions of law, 28 U.S.C. § 157(c)(1), in the court's view, considerations of judicial economy favor withdrawal of the reference.

2005 WL 4880619, at *3; *see also In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993) ("[T]he fact that a bankruptcy court's determination on non-core matters is subject to *de novo* review by the district court could lead the latter to conclude that in a given case unnecessary costs could be avoided by a single proceeding in the district court"); *In re Coe-Truman Tech., Inc.,* 214 B.R. 183, 187 (N.D. Ill. 1997) (where bankruptcy court's decision is subject to *de novo* review, it is a more efficient use of judicial resources to decide the case in the district court); *In re Almac's, Inc.,* 202 B.R. 648, 659 (D.R.I. 1996) (withdrawing reference to avoid the waste of judicial resources that would result from a *de novo* review of bankruptcy court's findings).

The same reasoning applies here. Because the bankruptcy court's work will be subject to plenary review and any trial must proceed in the district court, it would be inefficient either to wait until trial to withdraw the reference or to refer the case to the bankruptcy court for purposes of handling pretrial matters under Local Rule 200.1(b)(1)(D). The district court should follow

the approach in *Wellman* and these other cases and withdraw the reference now. This case simply is not one where the bankruptcy court has developed specialized knowledge about the claims or issues so that efficiencies would arise from that court's handling some part of the case up to trial. *E.g., Orion Pictures Corp.*, 4 F.3d at 1101 (mentioning this possibility). This case just began, and McGuireWoods had no involvement in Heartland's substantive bankruptcy case. The bankruptcy court also has had no chance to consider the substance of the malpractice claim against McGuireWoods. Nor does it have any special knowledge about the circumstances, witnesses, evidence, discovery, facts, or law on which that claim and McGuireWoods's defenses turn. *Compare Wellman*, 2005 WL 4880619, at *3 (holding that even in cases where the bankruptcy court has such knowledge, "that factor does not tip the scales against withdrawal in light of the other factors that favor withdrawal," including a jury demand, non-core claims, and the district court's plenary review).

Nor would withdrawing the reference promote "forum shopping." As explained above, Heartland—not McGuireWoods—should have brought this motion in the first instance, and McGuireWoods is now timely bringing the request at the earliest opportunity before any substantive activity in this case has occurred. *E.g.*, *In re Mahlmann*, 149 B.R. 866, 869 (N.D. Ill. 1993) ("The reason for the timeliness requirement is to prevent parties from forum shopping, stalling, or otherwise engaging in obstructionist tactics."). Attempting to remedy Heartland's noncompliance with Local Rule 200.1(c)(2)(A) by seeking to withdraw the reference where there is a jury demand and before any substantive consideration of the case cannot be labeled "forum shopping."

True, this case is unusual because the lawyers for Heartland and the Liquidating Trustee drafted Heartland's Chapter 11 plan to require that they initiate this adversary proceeding in the

bankruptcy court in the first instance, as the state court held.  But these same counsel have always recognized that this requirement could not limit the options of other parties—like McGuireWoods—who had no involvement in the Chapter 11 plan or proceeding.  (*In re Heartland*, No. 07-20188-jpk, Dkt. 2210 at 8 ("It would have been patently unfair for this Court to approve a plan that bound third parties to a choice of forum clause requiring state-law causes of action to be filed in the bankruptcy court.").)  That this case had to start in the bankruptcy court does not mean that it can or should proceed in bankruptcy court.  That conclusion is particularly true where Heartland's Chapter 11 plan was confirmed long ago and where the only claims being asserted are non-core, pre-petition, state-law claims to which there is a jury demand.  State-law claims for negligence—whether professional or otherwise—are the sorts of claims that federal district courts see not infrequently.

## IV.     THE BANKRUPTCY COURT HAS NO SUPERIOR "FAMILIARITY" WITH THE CASE.

The bankruptcy court also has no special "familiarity" with this case.  The case involves only a state-law claim—not any claim under the Bankruptcy Code or other legal issues with which the bankruptcy court has specialized knowledge.  *E.g.*, *In re Comdisco, Inc.*, 04 C 5570, 2004 WL 2674398 (N.D. Ill. Oct. 15, 2004) ("[T]he bankruptcy court' familiarity with the bankruptcy proceedings will not help it address the state law issues raised in adversary complaint.").  And the bankruptcy court has no particular familiarity with the facts of this case.  Although several adversary proceedings involving Heartland were filed in the bankruptcy court before this case, none involved legal malpractice, and certainly none involved McGuireWoods.  What duties McGuireWoods may have owed to Heartland and whether McGuireWoods appropriately discharged those duties are subjects that the bankruptcy court has not previously considered.

### V.      WITHDRAWING THE REFERENCE WOULD NOT CAUSE UNDUE DELAY OR COST.

Finally, withdrawing the reference would not only conserve judicial resources, but it would conserve the parties' resources as well.  Nothing substantive has transpired or should transpire in this adversary case until the district court rules on this motion.  (McGuireWoods is simultaneously presenting a request for a stay to the bankruptcy court so that the withdrawal of the reference is dealt with before other matters of substance.)  Withdrawing the reference accordingly has no potential to force the parties to replicate work.  In addition, the substantive component of Heartland's bankruptcy case ended years ago, so the time it takes to address the motion to withdraw the reference will not hold up other business in the bankruptcy court or prejudice Heartland or any other party.

* * * *

Other than Heartland's status as a former debtor in the bankruptcy court and the fact that Heartland's Chapter 11 plan required it to initiate this proceeding in the bankruptcy court, there is no connection between the claims in this case and the bankruptcy court and no reason for this case to continue in the bankruptcy court.  The district court accordingly should withdraw the reference and grant McGuireWoods a reasonable time to respond to the adversary complaint after ruling on this motion.

### CONCLUSION

For the foregoing reasons, the district court should grant McGuireWoods's motion.

Dated:  December 5, 2011                    Respectfully submitted,

                                            /s/ David C. Giles

                                            David C. Giles
                                            SCHIFF HARDIN LLP
                                            233 S. Wacker Drive
                                            Chicago, IL  60606
                                            (312) 258-5819

                                            *Counsel for Defendant*
                                            *McGuireWoods, LLP*

# EXHIBIT 1

Firm No. 91612

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

David Abrams, not individually )
but as Liquidating Trustee of )
Heartland Memorial Hospital, LLC )         2009L002543
                                  )         CALENDAR/ROOM  T
          Plaintiff,              )         TIME 00:00
      v.                          )   Case No. Other Com Litigation
                                  )
DLA Piper US LLP,                 )
McGuireWoods, LLP,                )         **JURY TRIAL DEMANDED**
Collins & Collins, Harold E. Collins )
and Michael R. Collins            )
                                  )
          Defendants.             )

### COMPLAINT

1.    Plaintiff David Abrams is the Liquidating Trustee of Heartland

Memorial Hospital, LLC ("Heartland") pursuant to a First Amended Liquidating

Plan of Reorganization filed by the Official Committee of Unsecured Creditors of

Heartland and confirmed by order of the United States Bankruptcy Court for the

Northern District of Indiana, Hammond Division, on November 19, 2008. The Plan

and Confirmation Order authorize the Trustee to liquidate Heartland's assets and

to pursue all causes of action vested with it and its creditors.

2.    Defendant DLA Piper US LLP is, on information and belief, a limited

liability partnership. The business of DLA Piper is the practice of law and it has a

substantial place of business in Chicago.

3.      Defendant McGuireWoods LLP is, on information and belief, a limited liability partnership. The business of McGuireWoods is the practice of law and it has a substantial place of business in Chicago.

4.      Defendant Collins & Collins is a general partnership organized under the laws of Illinois. The business of Collins & Collins is the practice of law and its principal place of business is in Chicago.

5.      Defendants Harold E. Collins and Michael R. Collins are both attorneys and partners in Collins & Collins. At all times relevant to the claims made against him, Harold E. Collins was also an officer and a director of Heartland.

### The History of Heartland Memorial Hospital, LLC

6.      Illiana Surgery Center, L.L.C. ("ISC") was organized as an Indiana limited liability company on or about February 16, 1999.

7.      On or about March 16, 1999, ISC renamed itself Illiana Surgery and Medical Center, L.L.C. ("Illiana").

8.      On or about May 18, 2006, Illiana renamed itself Heartland Memorial Hospital, LLC ("Heartland"). In this complaint, the plaintiff will refer to this entity as "Heartland."

9.      iHealthcare, Inc. ("iHealthcare") is an Indiana corporation that was formed on or about June 6, 2002 and was the sole owner of the equity of Heartland.

10.     Throughout its history, Heartland operated a number of for-profit, physician owned, healthcare practices in Indiana and Illinois.

2

11.     From about 2002 until 2004, Heartland undertook the development and construction of a 55-bed ambulatory care facility located at 701 Superior Street in Munster, Indiana ("the Munster hospital facility"). When completed, the Munster hospital facility was to become the main focus of Heartland's business activities.

12.     From 2004 until about October of 2005, Heartland's business affairs were managed by the directors of iHealthcare through a management committee for Heartland comprised of Vijay Gupta, M.D., Harold E. Collins, Karen Briggs, D.O., Mark Efrusy, D.O., Ramon Halum, M.D., John Kniaz, D.O., David Ray, D.P.M., Jagdish Patel, M.D., Vijay Patel, M.D., Shaun Kondamuri, M.D., Randall Morgan, Jr., M.D., Jeffrey Yessenow, M.D., and Thomas McDermott, Sr. (collectively, the "Old Management").

13.     After October of 2005, Heartland was managed by Yessenow, Hilton Hudson, Paul Jones, Leroy Wright and Alfred Sharp (collectively, "the New Management").

14.     Unfortunately for the majority of its creditors, Heartland lacked sufficient capital to complete construction of the Munster hospital facility and it was, at all relevant times, insolvent. Notwithstanding its insolvency, Heartland engaged in a number of transactions which allowed insiders to receive monetary benefits to the detriment of its creditors.

### The First Sale and Leaseback to Munster Medical Holdings, LLC.

15.     Munster Medical Holdings, L.L.C. ("Munster Holdings"), an Indiana limited liability company, was formed on January 27, 2004.

3

16.     Initially, the members of Munster Holdings were Thomas McDermott, Sr. and Neil Fribley, individually and through an investment entity known as Eliza Investments. Fribley and Eliza Investments are jointly referred to as "Fribley."

17.     On information and belief, McDermott and Fribley each initially owned 50% of the equity of Munster Holdings.

18.     It appears that sometime prior to March 16, 2004, McDermott made one or more advances to Heartland. These advances totaled about $2.5 million.

19.     This purported debt was evidenced by a $2,533,795 promissory note dated as of March 16, 2004, and executed by Heartland in favor of McDermott.

20.     On or about August 30, 2004, Heartland entered into a "sale/leaseback" agreement with Munster Holdings. Under the terms of this agreement, Heartland agreed to sell the Munster hospital facility to Munster Holdings for $30 million. Heartland agreed to then lease the Munster hospital facility from Munster Holdings pursuant to a long-term lease. The base rent under this lease was $298,723 a month for the first five years.

21.     On information and belief, on or about August 30, 2004, McDermott contributed his Heartland promissory note to Munster Holdings. In return, McDermott apparently received a 27.5% interest in Munster Holdings.

22.     On information and belief, on or about August 30, 2004, Yessenow received a 20% interest in Munster Holdings, in exchange for a contribution to Munster Holdings which was allegedly valued to be $2 million.

4

23. On information and belief, on or about August 30, 2004, Fribley received a 22.5% interest in Munster Holdings in exchange for a $500 contribution.

24. On information and belief, on or about August 30, 2004, Ed Krusa received a 5% interest in Munster Holdings in exchange for the contribution of certain "services" to Munster Holdings.

25. Under the terms of the sale/leaseback agreement, Heartland was to receive, at closing, a 25% interest in Munster Holdings.

26. In order to fund a portion of the $30 million purchase price, Munster Holdings arranged for a $25,500,000 loan from GE Capital, repayment of which was secured by a lien on the Munster hospital facility.

27. The sale/leaseback transaction between Heartland and Munster Holdings ("the Munster Holdings transaction") closed on or about December 22, 2004.

28. On information and belief, some or all of the remaining consideration paid to Heartland was in the form of the forgiveness of debt that it allegedly owed to McDermott and Yessenow.

29. Heartland retained the right and option to repurchase the real estate on the terms of the purchase option set forth in the purchase agreement. Heartland could purchase the real estate for $30 million plus certain additional items, including a cost of living increase and an agreement to provide Munster Holdings a guaranteed return on its equity in the amount of 12%, if the option was exercised before October 1, 2009.

5

30. On information and belief, additional parties were given equity interests in Munster Holdings during the time that it owned the Munster hospital facility including, without limitation, Vijay Patel and Jagdish Patel.

31. In December of 2005, McDermott sold or transferred his 27.5% interest in Munster Holdings to Heartland in exchange for 75% of Heartland's ownership interest in a wholly-owned subsidiary of Heartland known as Broadwest Surgery Center, thereby increasing Heartland's ownership of Munster Holdings to 52.5%.

32. On information and belief, Jagdish Patel acquired 6.25% of Munster Holdings. At some point thereafter, he transferred the interest to Heartland, thereby increasing Heartland's interest in Munster Holdings to 58.75%.

33. The effect of the Munster Holdings transaction was, on information and belief, to render Heartland insolvent. The Munster Holdings transaction stripped Heartland of its major asset, leaving it with a disproportionately small equity interest in Munster Holdings, but obligating it to pay a liability in the form of monthly lease payments of about $298,723 per month to Munster Holdings, payments which were burdensome and detrimental to Heartland's best interests.

## Old Management Cedes Management Control to Unqualified Managers

34. After the closing of the Munster Holdings transaction, Heartland continued to suffer losses, and was having difficulty paying its creditors. For example, Heartland failed to pay approximately $900,000 in employee withholding taxes owed to the Internal Revenue Service and the Indiana Department of Revenue for the period from April, 2005 until October, 2005.

6

35.    In early 2005, Heartland, through Gupta and Collins, embarked on an effort to locate a buyer for Heartland's assets and/or their equity interest in iHealthcare. Eventually, Heartland located such a buyer, Wright Capital Partners, a purported investment banking firm.

36.    On information and belief, Wright Capital Partners was owned and controlled by Wright. Sharp and Allen Hill had employment relationships with Wright Capital Partners or Leroy Wright.

37.    Already insolvent, Heartland's financial condition continued to worsen. In October, 2005, it required an immediate equity infusion in order to continue to operate.

38.    Wright and his business associates, Sharp and Hill, expressed a strong desire to purchase the equity in iHealthcare from its shareholders, which included Old Management.

39.    iHealthcare was at all relevant times the sole member of Heartland.

40.    In October, 2005, Wright Capital Partners offered to lend Heartland up to $2.5 million, provided that Wright, Sharp and Hill were placed in immediate control of Heartland.

41.    The Old Management agreed, without due regard to the best interests of Heartland and its creditors, to place Wright, Sharp and Hill in control of Heartland, with complete control over its finances.

7

## Sale of Equity in iHealthcare to Wright Capital Partners

42.   In October of 2005, the shareholders of iHealthcare, including the Old Management, agreed to sell their individual shares in iHealthcare to Wright Capital Partners for approximately $25 million.

43.   iHealthcare's shareholders and Wright Capital Partners entered into a stock purchase transaction in the fall of 2005. However, the transaction was not consummated because Wright Capital Partners lacked the necessary funds to do so.

44.   As a result, the parties began a series of negotiations which resulted in a revised purchase agreement. This amended purchase agreement was closed on or about March 24, 2006.

45.   The sale of the equity interests in iHealthcare was accomplished through a "leveraged finance transaction" or "leveraged buy-out transaction" in which Heartland entered into a sale/leaseback transaction. Heartland then, through a series of transactions, caused the sale proceeds to be paid to the Old Management in exchange for Old Management transferring their ownership interests in iHealthcare to Wright Capital Partners, or its nominee.

46.   In effect, Wright Capital Partners purchased Heartland with the proceeds from the sale of Heartland's own assets.

47.   As a result of this sale, Gupta and Collins together received a total of about $2.5 million out of the roughly $7.3 million paid to the selling shareholders of iHealthcare.

8

## The AIC Sale/Leaseback Transaction

48. Wright, Sharp and Hill were able to raise the funds to pay to the iHealthcare shareholders by selling Heartland's ancillary real estate assets and then causing Heartland to lease these assets back from the purchaser (the "AIC/Leaseback transaction").

49. Wright Capital Partners, Wright, Sharp and/or Hill formed Wright Health Systems, Inc., a Maryland corporation ("WSI") on or about September 28, 2005. WSI changed its name to TWG Illiana Surgery and Medical Center, Inc. ("TWG") on or about April 25, 2006. TWG changed its name to Heartland Memorial Holdings, Inc. ("Holdings") on or about September 12, 2006.

50. On information and belief, Heartland entered into a transaction with NL Venture V, LP, acting on behalf of AIC Holding V, LLP ("AIC") whereby AIC agreed to purchase substantially all of Heartland's "ancillary" real estate assets for $18 million. These assets consisted of certain physician practices commonly referred to as Justice, Broadway, 89th Avenue, 9132 Munster, 9136 Munster and Schererville. Simultaneously, AIC entered into a lease agreement with Heartland for these properties for a monthly rental of about $163,000 per month.

51. Of the $18 million in proceeds generated by the AIC/Leaseback transaction, about $650,000 was paid to AIC in the form of fees, and about $382,000 was paid to DLA Piper, as counsel for TWG/Wright Capital Partners.

52. About $7.3 million of the sale proceeds was distributed to the selling shareholders of iHealthcare.

9

53.   The Old Management knew and should have known that the AIC/Leaseback transaction was entered into by Heartland not for the benefit of Heartland and its creditors, but for the specific benefit of the Old Management, the owners of iHealthcare. This transaction enriched the Old Management at the direct expense of Heartland and its creditors.

54.   When the Old Management allowed Wright, Hill, Sharp, TWG and Wright Capital Partners to usurp the management of Heartland, the Old Management failed to properly monitor Heartland by, for example, its continuing failure to pay employee withholding taxes owed to the Internal Revenue Service and the Indiana Department of Revenue.

55.   The Old Management's abdication of control of Heartland in favor of Wright, Hill and Sharp resulted in Heartland entering into the AIC/Leaseback transaction, which resulted in Heartland selling assets to raise funds for distributions to the members of Old Management while it was insolvent, to the detriment of its creditors.

56.   The AIC/Leaseback transaction resulted in the transfer of about $7.3 million of Heartland's assets to the equity owners of iHealthcare (including the Old Management). Heartland was left in an untenable financial posture, bereft of assets and consumed by liabilities.

## Heartland's Finances Deteriorate Further in the Hands of its New Management

57.   Upon the closing of the AIC/Leaseback transaction, on or about March 24, 2006, Heartland was managed by the New Management.

10

58.     New Management assumed complete control over the management and business affairs of Heartland. However, the financial deterioration of Heartland continued under New Management.

59.     For example, New Management continued the failure to pay employee withholding taxes, allowing these obligations to increase to $4 million to the Internal Revenue Service and $500,000 to the Indiana Department of Revenue.

60.     Notwithstanding Heartland's precarious financial position, New Management authorized or permitted it to pay Wright, Sharp and/or Wright Capital Partners not less than $500,000.

61.     On or about March 24, 2006, New Management also authorized Heartland to pay DLA Piper at least $382,000 for its representation of Wright Capital Partners in the AIC/Leaseback transaction.

62.     In November of 2006, New Management authorized or permitted Heartland to pay $300,000 to Wright Capital Partners in order to allow Holdings to redeem the equity interest(s) of Wright Capital Partners, Wright and/or Sharp in Holdings.

63.     New Management permitted Heartland's finances to deteriorate further to the point that it repeatedly failed to pay vendors, allowed judgments to be taken against it and permitted judgment liens to be recorded against its assets. Nevertheless, in an effort to maintain the facade that it was still a viable entity, New Management allowed Heartland to borrow money from various lenders, including not less than $3 million from private individuals.

64. New Management knew or should have known that Heartland could not repay this additional indebtedness obtained from private individuals.

65. Faced with unyielding financial pressure, New Management resorted to a sale-leaseback involving Heartland's only significant remaining asset, its interest in Munster Holdings and the Munster hospital facility.

**The SSFHS Transaction**

66. On October 31, 2006, Heartland and Munster Holdings sold the Munster hospital facility and most of its operating equipment to the Sisters of St. Francis Health Services ("SSFHS"), for $42.8 million.

67. As was its pattern, Heartland agreed to lease back the facility and the operating equipment from SSFHS ("the SSFHS Sale/Leaseback transaction").

68. The SSFHS Sale/Leaseback transaction was not in the best interests of Heartland or its creditors for several reasons.

69. Heartland lacked sufficient funds to afford the monthly lease payments amounting to about $500,000 per month under the lease with SSFHS.

70. In addition, New Management authorized or permitted the majority—if not all—of the available sale proceeds (after the payment of mortgages) from the SSFHS Sale/Leaseback transaction to be allocated to Munster Holdings, but allowed Heartland to assume all of the obligations under the lease with SSFHS.

71. On information and belief, New Management authorized or permitted Heartland to transfer at least 17.5% of its interest in Munster Holdings to Yessenow. As a result, Yessenow had 37.5% of Munster Holdings, which resulted in distribution to him of $2.2 million from the SSFHS Sale/Leaseback transaction.

12

72.     Certain proceeds of the SSFHS Sale/Leaseback transaction were distributed as follows:

| | |
|---|---|
| ████████████████████ | |
| Michael W. Back, P.C.<br>(Munster Holdings attorney) | $ 110,473.00 |
| Eliza Investments, LLC<br>(Munster Holdings Member) | 1,682,084.00 |
| Fribley & Associates, LLC<br>(Munster Holdings Member) | 280,000.00 |
| Vijay Patel<br>(Munster Holdings Member) | 2,240,656.00 |
| Chicago Title & Trust Co.<br>Escrow# 26066063-002<br>(Munster Holdings Member)<br>For benefit of Vijay Patel | 366,677.00 |
| Edward Krusa<br>(Munster Holdings Member) | 504,280.00 |
| Thomas McDermott, Sr.<br>(purported Munster Holdings<br>Member) | 143,406.00 |
| Jeffrey Yessenow<br>(Munster Holdings Member) | 2,214,647.00 |
| **TOTAL** | **$7,542,223.00** |

73.     Heartland received a disproportionately small portion of the proceeds from the SSFHS Sale/Leaseback transaction due to the decision regarding the allocation of the purchase price between Heartland and Munster Holdings.

13

74. This misallocation of sale proceeds was further exacerbated by Heartland's decision, made prior to or at the closing of the SSFHS Sale/Leaseback transaction, to transfer some or all of its interest in Munster Holdings to McDermott, Yessenow and others.

75. As a result of these transfers and the apparent consent to the allocation of the purchase price between it and Munster Holdings, Heartland was deprived of its rightful share of the proceeds of the SSFHS Sale/Leaseback transaction.

### Count I

### Legal Malpractice against Collins & Collins and Harold E. Collins

76. For paragraph 76, plaintiff incorporates by reference the allegations of paragraphs 1-75.

77. For a number of years prior to the Sale of Equity in iHealthcare to Wright Capital Partners and the AIC/Leaseback Transaction, Harold E. Collins and Collins & Collins acted as General Counsel to Heartland. On information and belief, Harold E. Collins and Collins & Collins continued to act as General Counsel to Heartland through the date of the merger with Wright Capital in March of 2006.

78. As Heartland's General Counsel, Harold E. Collins and Collins & Collins had a duty to competently represent Heartland in all matters that Heartland would reasonably have understood to be within the scope of its engagement, and to exercise that degree of knowledge, care, skill, ability, prudence and diligence as ordinarily possessed and exercised by other attorneys licensed to

14

practice law in the states of Illinois and Indiana, who hold themselves out as having expertise in business transactions, real estate transactions, debtor-creditor relations, and corporate and partnership law.

79.     In connection with the Sale of Equity in iHealthcare to Wright Capital Partners and the AIC/Leaseback Transaction, Harold E. Collins and Collins & Collins breached their duties to Heartland because, among other things, at the time of that transaction, Harold E. Collins and Collins & Collins knew or should have known that there were serious questions about the financial viability of Heartland as an operating entity. Notwithstanding this knowledge, Harold E. Collins and Collins & Collins failed to warn its client Heartland and otherwise facilitated a transaction in which: (a) $7.3 million in assets of Heartland were monetized so that this amount could be transferred to shareholders of Heartland's parent entity; (b) Heartland was saddled with substantially disadvantageous lease terms that would inevitably cause a further and more rapid deterioration in its already precarious financial condition; (c) Heartland was saddled with an incompetent management team; and (d) Heartland paid $382,000 in DLA Piper's legal fees for its work on the merger even though the merger documents specified that each party to the merger was to bear its own legal fees.

80.     Had Heartland been properly and competently advised by Harold E. Collins and Collins & Collins, it would not have engaged in the Sale of Equity in iHealthcare to Wright Capital Partners and the AIC/Leaseback Transaction, or it would have engaged in those transactions only on terms that were in its interest.

15

81.     As a direct and proximate result of the breach of duty by Harold E. Collins and Collins & Collins, Heartland was damaged in the manner described in paragraph 79.

**WHEREFORE,** plaintiff David Abrams, as Trustee of Heartland, prays for a judgment against defendants Harold E. Collins and Collins & Collins in an amount to be proven at trial, but in no event less than fifty thousand dollars ($50,000.00), for the costs of this suit and for such further relief as the Court deems just and equitable.

### Count II

### Breach of Fiduciary Duty against Collins & Collins and Harold E. Collins

82.     For paragraph 82, plaintiff incorporates by reference the allegations of paragraphs 1-81.

83.     As its attorneys, Harold E. Collins and Collins & Collins owed Heartland fiduciary duties, including the duty of loyalty and the duty not to put their own interests or the interests of other clients above those of Heartland.

84.     Harold E. Collins and Collins & Collins breached their fiduciary duties to Heartland in that Collins had a financial stake in transactions with his client in that he had an ownership interest in the Justice property described in paragraph 50 and he was also a shareholder in iHealthcare. Accordingly, Collins engaged in a business transaction with his client in which he placed his own interest above that of Heartland, failed to advise Heartland against engaging in the Wright merger and the AIC/Leaseback Transaction, and otherwise facilitated a transaction in which:

16

(a) $7.3 million in assets of Heartland were monetized so that this amount could be transferred to shareholders of Heartland's parent entity, including Collins; (b) Heartland was saddled with substantially disadvantageous lease terms that would inevitably cause a further and more rapid deterioration in its already precarious financial condition; (c) Heartland was saddled with an incompetent management team; and (d) Heartland paid $382,000 in DLA Piper's legal fees for its work on the merger even though the merger documents specified that each party to the merger was to bear its own legal fees.

85.     As a direct and proximate result of the breaches of fiduciary duty by Harold E. Collins and Collins & Collins, Heartland was damaged in the manner described in paragraph 84.

**WHEREFORE,** plaintiff David Abrams, as Trustee of Heartland, prays for a judgment against defendants Harold E. Collins and Collins & Collins in an amount to be proven at trial, but in no event less than fifty thousand dollars ($50,000.00), for the costs of this suit and for such further relief as the Court deems just and equitable.

## Count III

### Breach of Fiduciary Duty against Harold E. Collins

86.     For paragraph 86, plaintiff incorporates by reference the allegations of paragraphs 1-85.

17

87.   As an officer and director of Heartland, Harold E. Collins owed it fiduciary duties, including the duty of loyalty and the duty not to put his own interests above those of Heartland.

88.   In connection with the Sale of Equity in iHealthcare to Wright Capital Partners and the AIC/Leaseback Transaction, Harold E. Collins breached his fiduciary duties as an officer and a director of Heartland because, among other things, at the time of that transaction, Harold E. Collins knew or should have known that there were serious questions about the financial viability of Heartland as an operating entity. Notwithstanding this knowledge, Harold E. Collins failed to warn Heartland and otherwise facilitated a transaction in which: (a) $7.3 million in assets of Heartland were monetized so that this amount could be transferred to shareholders of Heartland's parent entity; (b) Heartland was saddled with substantially disadvantageous lease terms that would inevitably cause a further and more rapid deterioration in its already precarious financial condition; (c) Heartland was saddled with an incompetent management team; and (d) Heartland paid $382,000 in DLA Piper's legal fees for its work on the merger even though the merger documents specified that each party to the merger was to bear its own legal fees.

89.   As a direct and proximate result of these breaches of fiduciary duty by Harold E. Collins, Heartland was damaged in the manner described in paragraph 88.

18

**WHEREFORE,** plaintiff David Abrams, as Trustee of Heartland, prays for a judgment against defendant Harold E. Collins in an amount to be proven at trial, but in no event less than fifty thousand dollars ($50,000.00), for the costs of this suit and for such further relief as the Court deems just and equitable.

Count IV

**Legal Malpractice against McGuireWoods**

90.  For paragraph 90, plaintiff incorporates by reference the allegations of paragraphs 1-89.

91.  In connection with the Sale of Equity in iHealthcare to Wright Capital Partners, McGuireWoods acted as attorney to iHealthcare and its shareholders.

92.  Concurrently, McGuireWoods represented, and had an attorney-client relationship with, Heartland.

93.  As attorneys for Heartland, McGuireWoods had a duty to competently represent Heartland in all matters that Heartland would reasonably have understood to be within the scope of its engagement, and to exercise that degree of knowledge, care, skill, ability, prudence and diligence as ordinarily possessed and exercised by other attorneys licensed to practice law in the states of Illinois and Indiana, who hold themselves out as having expertise in business transactions, real estate transactions, debtor-creditor relations, and corporate and partnership law.

94.  McGuireWoods knew that the Sale of Equity in iHealthcare to Wright Capital Partners was being funded by means of the AIC/Leaseback Transaction,

19

and McGuireWoods knew or should have known the material terms of the AIC/Leaseback Transaction.

95.    In connection with the Sale of Equity in iHealthcare to Wright Capital Partners and the AIC/Leaseback Transaction, McGuireWoods breached its duties to Heartland because, among other things, at the time of that transaction, McGuireWoods knew or should have known that there were serious questions about the financial viability of Heartland as an operating entity. Notwithstanding this knowledge, McGuireWoods failed to warn its client Heartland and otherwise facilitated a transaction in which: (a) $7.3 million in assets of Heartland were monetized so that this amount could be transferred to shareholders of Heartland's parent entity; (b) Heartland was saddled with substantially disadvantageous lease terms that would inevitably cause a further and more rapid deterioration in its already precarious financial condition; (c) Heartland was saddled with an incompetent management team; and (d) Heartland paid $382,000 in DLA Piper's legal fees for its work on the merger even though the merger documents specified that each party to the merger was to bear its own legal fees.

96.    Had Heartland been properly and competently advised by McGuireWoods, it would not have engaged in the Sale of Equity in iHealthcare to Wright Capital Partners and the AIC/Leaseback Transaction, or it would have engaged in those transactions only on terms that were in its interest.

97.    As a direct and proximate result of the breach of duty by McGuireWoods, Heartland was damaged in the manner described in paragraph 95.

**WHEREFORE,** plaintiff David Abrams, as Trustee of Heartland, prays for a judgment against defendant McGuireWoods in an amount to be proven at trial, but in no event less than fifty thousand dollars ($50,000.00), for the costs of this suit and for such further relief as the Court deems just and equitable.

## Count V

### Legal Malpractice against DLA Piper

98.   For paragraph 98, plaintiff incorporates by reference the allegations of paragraphs 1-97.

99.   DLA Piper acted as attorney for Wright Capital Partners in connection with the Sale of Equity in iHealthcare to Wright Capital Partners. In addition, at the time Wright Capital Partners took operational control of Heartland on or about October 10, 2005, DLA Piper began representing Heartland.

100.   In addition, DLA Piper specifically acted as Heartland's attorney in connection with the AIC/Leaseback Transaction.

101.   As its attorney, DLA Piper had a duty to competently represent Heartland in all matters that Heartland would reasonably have understood to be within the scope of its engagement, and to exercise that degree of knowledge, care, skill, ability, prudence and diligence as ordinarily possessed and exercised by other attorneys licensed to practice law in the states of Illinois and Indiana, who hold themselves out as having expertise in business transactions, real estate transactions, debtor-creditor relations, and corporate and partnership law.

21

102.  DLA Piper breached its duties to Heartland in connection with the transactions described in this complaint by, among other things:

### A)  Sale of Equity in iHealthcare to Wright Capital Partners.

At the time of the transaction between iHealthcare's shareholders and Wright Capital Partners, DLA Piper knew or should have known that there were serious questions about the financial viability of Heartland as an operating entity. Notwithstanding this knowledge, DLA Piper provided substantial legal assistance directed toward the completion of a transaction through which: (a) $7.3 million in assets of Heartland were monetized so that this amount could be transferred to shareholders of Heartland's parent entity; (b) Heartland was saddled with substantially disadvantageous lease terms that would inevitably cause a further and more rapid deterioration in its already precarious financial condition; (c) Heartland was saddled with a management team headed by a man (Wright) that DLA Piper would, within a matter of four months, attempt to replace; and (d) Heartland paid $382,000 in DLA Piper's legal fees for its work on the merger even though the merger documents specified that each party to the merger was to bear its own legal fees.

### B)  Redemption Agreement.

Within four months of the merger, DLA Piper explicitly acknowledged that Heartland's financial condition was "perilous" and that there were serious questions about its "survivability." (Ex. A). Accordingly, DLA Piper "evolved and proposed" the redemption transaction whose principal effect was to remove Wright as an owner of

22

Heartland. DLA Piper benefited substantially from the redemption because, as part of that transaction, Heartland agreed to "assume and be responsible for payment of over $883,000 in DLA Piper invoices that "reflect work performed for and on behalf of Wright." (Ex. B).

### C) The SSFHS Transaction.

At the time of the SSFHS Transaction, DLA Piper knew or should have known that Heartland's financial condition remained "perilous" and that there were even more serious questions about its "survivability" and the financial viability of Heartland as an operating entity. Notwithstanding this knowledge, DLA Piper provided substantial legal assistance directed toward the completion of a transaction through which: (a) Heartland's only remaining substantial asset was monetized so that some $7 million could be transferred to Munster Holdings; (b) Heartalnd paid more than it was contractually obligated to pay to Munster Holdings for the property; (c) Heartland did not receive the entire amount it was due for its interest in Munster Holdings; (d) Heartland paid $660,000 to Hilton Hudson on a dubious note; (e) Munster Holdings received the consideration for 8 acres of land that belonged to Heartland; and (f) Heartland was provided with cash to pay DLA Piper's legal fees.

103.   Had Heartland been properly and competently advised by DLA Piper, it would not have engaged in the transactions described in the preceding paragraphs, or it would have engaged in them only on terms that were in its interest.

104. As a direct and proximate result of DLA Piper's breach of duty, Heartland was damaged in the manner described in paragraph 102.

**WHEREFORE,** plaintiff David Abrams, as Trustee of Heartland, prays for a judgment against defendant DLA Piper in an amount to be proven at trial, but in no event less than fifty thousand dollars ($50,000.00), for the costs of this suit and for such further relief as the Court deems just and equitable.

### Count VI

### Breach of Fiduciary Duty against DLA Piper

105. For paragraph 105, plaintiff incorporates by reference the allegations of paragraphs 1-104.

106. As its attorneys, DLA Piper owed Heartland fiduciary duties, including the duty of loyalty and the duty not to put its own interests or the interests of its other clients above those of Heartland.

107. DLA Piper breached its fiduciary duties to Heartland as described in paragraph 102 in that it (a) placed the interest of other clients, particularly Wright Capital Partners and its related persons and entities above those of Heartland, and (b) maneuvered to have Heartland pay it for work that the firm performed for other clients.

108. As a direct and proximate result of the breaches of fiduciary duty by DLA Piper, Heartland was damaged in the manner described in paragraph 107.

**WHEREFORE,** plaintiff David Abrams, as Trustee of Heartland, prays for a judgment against defendant DLA Piper in an amount to be proven at trial, but in no

event less than fifty thousand dollars ($50,000.00), for the costs of this suit and for such further relief as the Court deems just and equitable.

## Count VII

### Legal Malpractice against Michael R. Collins and Collins & Collins

109. For paragraph 109, plaintiff incorporates by reference the allegations of paragraphs 1-108.

110. The Women's Wellness Center ("WWC") is an Indiana Professional Corporation located in Munster, Indiana.

111. Prior to June 16, 2003, Yessenow was the President, Treasurer, Secretary and sole shareholder of WWC.

112. On or about June 16, 2003, Heartland entered into an agreement with Yessenow in which Yessenow agreed to sell 100% of the issued and outstanding shares of WWC to Heartland in exchange for: (a) $1 million in cash at closing; (b) $1 million to be paid pursuant to the terms of a promissory note; and (c) $1 million to be paid under a Development and Consulting Services Agreement.

113. In the transaction in which it purchased the WWC from Yessenow, Heartland was represented by defendants Michael R. Collins and Collins & Collins.

114. As part of the services that it performed for Heartland in the WWC transaction, Michael R. Collins issued and signed, on behalf of Collins & Collins, an Opinion of the Purchaser's Counsel, a copy of which is attached as Exhibit C. In this Opinion, Collins opined (among other things) that "[t]he execution and delivery by [Heartland] of the Agreement does not, and [Heartland's] compliance with the

25

terms thereof will not, violate or conflict with or constitute a default under any term or provision of the articles of organization or operating agreement of Purchaser, any law, statute, government regulation, or, to the best of such counsel's knowledge, any license, judgment, decree, order, agreement, indenture, or other instrument applicable to Purchaser."

115. Heartland relied on this Opinion in making its decision to enter into and close the WWC transaction.

116. Heartland did in fact close the transaction by which it acquired the WWC from Yessenow. At the closing, Heartland paid Yessenow the $1 million in cash, and it subsequently made substantial payments to him under the promissory note and the Development and Consulting Services Agreement.

117. The Indiana Professional Corporations Act, Ind. Code, §§23-1.5-3-1 (a) and (b), restricts ownership of the stock in professional corporations to certain persons and entities, and Heartland is not one of the permitted entities. Accordingly, Heartland's acquisition of WWC was legally void.

118. When it discovered that the WWC transaction was void, Heartland sued Yessenow seeking rescission, restitution and other relief. *In re Heartland Memorial Hospital, LLC, (Heartland Memorial Hospital, LLC v Jeffrey Yessenow, MD)*, Case no: 07-20188-JPK-11 (U.S. Bankruptcy Court for the Northern District of Indiana, Hammond Division). Yessenow filed a counterclaim in that suit seeking relief from various defendants.

119. Collins & Collins and Michael R. Collins had a duty to exercise due care in the performance of legal services for Heartland and, in particular, to refrain from issuing its erroneous Opinion, knowing that Heartland would be relying on that Opinion.

120. Because the WWC transaction was void *ab initio*, the issuance of the Opinion by Collins & Collins and Michael R. Collins was negligent and a breach of the duty it owed to its client, Heartland.

121. Heartland was damaged as a direct and proximate result of its reliance on the Opinion in that it closed a transaction that it would not otherwise have closed.

122. Heartland was damaged by the negligence of Collins & Collins and Michael R. Collins in the following ways, among others: (a) it paid money to Yessenow pursuant to the terms of the void agreement; (b) it paid legal fees to Collins & Collins for negligent legal services; and (c) it incurred substantial costs in the litigation with Yessenow over the void agreement.

**WHEREFORE,** plaintiff David Abrams, as Trustee of Heartland, prays for a judgment against defendants Michael R. Collins and Collins & Collins in an amount to be proven at trial, but in no event less than fifty thousand dollars ($50,000.00), for the costs of this suit and for such further relief as the Court deems just and equitable.

### Demand for Jury Trial

Plaintiff demands a jury trial on all issues so triable.

27

By: _____
One of Plaintiff's Attorneys

Robert F. Coleman
Steven R. Jakubowski
Sean B. Crotty
Eugene J. Schiltz
Elizabeth E. Richert
Coleman Law Firm
77 West Wacker Drive, Suite 4800
Chicago, Illinois 60601-1812
Tel: (312) 444-1000
Fax: (312) 444-1028
Firm No. 91612

28