**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| HEARTLAND MEMORIAL HOSPITAL, LLC, | ) | |
| an Indiana limited liability company, and DAVID | ) | |
| ABRAMS as Liquidating Trustee of Heartland | ) | |
| Memorial Hospital, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No. 2:12-CV-021-PPS-PRC |
| | ) | |
| v. | ) | |
| | ) | |
| MCGUIREWOODS, LLP, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This is a legal malpractice case that emanates out of an unwieldy and complex

bankruptcy proceeding involving Heartland Memorial Hospital, LLC.  Heartland, the bankrupt

entity, as well as the bankruptcy trustee, allege that the law firm McGuireWoods, LLP

committed legal malpractice when it worked on the sale of Heartland from one parent company

to another.  They claim that the deal transferred substantial funds out of Heartland at a time

when the company shouldn't have been giving away its money.  According to them,

McGuireWoods should have at least cautioned Heartland about the consequences of the sale.

There's a flaw in this theory, however.  McGuireWoods was never engaged to represent

Heartland.  Instead, it was hired by iHealthcare, Inc., Heartland's parent company, to represent *it*

in the deal.  So the question is whether McGuireWoods can be liable to the subsidiary company

(Heartland) for malpractice when it never formally agreed to represent it.

Heartland claims that because iHealthcare was Heartland's sole owner and manager,

Heartland reasonably understood McGuireWoods to be its attorney as well.  And perhaps it did.

But the attorney-client relationship is a two-way street.  It's not enough for Heartland to believe that McGuireWoods was its lawyer – the firm must consent as well.  Yet the Complaint is silent on this issue.  There's not a single alleged fact suggesting that McGuireWoods knew or should have known that Heartland considered it to be its lawyer, much less that the McGuireWoods affirmatively agreed to the representation.

This isn't to say that it is impossible to allege such facts.  Maybe McGuireWoods was familiar enough with iHealthcare's and Heartland's ownership and management structure and operations to know that representing one meant representing the other.  But then the plaintiffs need to allege that.  They haven't so far.  Accordingly, for the reasons that I'll discuss below, McGuireWoods' Motion to Dismiss is **GRANTED**, and the Complaint is **DISMISSED WITHOUT PREJUDICE**.

## FACTS AND PROCEDURAL BACKGROUND

It's not necessary to spend much time summarizing the bankruptcy proceedings involving Heartland in order to decide McGuireWoods' dismissal motion.  Suffice it to say that the bankruptcy proceeding is extremely complex and involves dozens of players.  Fortunately, for present purposes, I only need to focus on the relationship between Heartland and McGuireWoods.

There are three parties to this lawsuit.  The first plaintiff, Heartland, is an Indiana LLC that is currently in the midst of bankruptcy proceedings in this district.  (DE 10 at 5.) Heartland's co-plaintiff is the bankruptcy trustee, who was appointed to manage and represent Heartland in November 2008.  (*Id.*)  Heartland and its trustee have identical interests in this immediate lawsuit, so for ease of reference I will refer to the plaintiffs together as "Heartland" unless further specificity is required.  The defendant is McGuireWoods, a large international law firm with nineteen offices scattered throughout the United States and Europe.  (*Id.* at 6.)

-2-

Heartland was a wholly owned subsidiary of iHealthcare, and in October 2005, iHealthcare decided to sell its shares in Heartland to a third party, Wright Capital Partners, for approximately $25 million.  (*Id.* at 13.)  The sale was accomplished through what is called a "leveraged buy out."  (*Id.*)  That's a type of transaction in which a buyer borrows the funds needed to purchase an acquisition and then sells or pledges that company's assets to service the debt – essentially, the acquired company pays its own sale price.  In this case, in order to secure the necessary funds, Heartland sold its interest in a group of physician practices for $18 million, and then it leased those assets back.  (*Id.* at 14.)  This sort of arrangement, in which a company sells an asset for an up front cash payment but then leases it back to use over the long term, is called a "leaseback" or "sale-and-leaseback" transaction.

The Complaint alleges that a significant portion of the proceeds from the transaction ($7.3 million) was distributed to iHealthcare and its shareholders instead of being used to pay down Heartland's debt.  (*Id.* at 15.)  Therefore, Heartland contends that the practical effect of the deal was to "monetize" Heartland's assets and extract the resulting funds, all at a time when Heartland was insolvent or nearly so.  (*Id.* at 20.)  Heartland asserts that under the state law that it says should apply here, when a subsidiary approaches insolvency, its owner has an additional duty to protect the creditors in the financially-troubled entity.  (DE 17 at 12-13.)

That's where McGuireWoods comes in.  As I mentioned, it represented the parent company, iHealthcare, in the leveraged buy out and leaseback deal.  This appears to be the only matter that McGuireWoods ever worked on for iHealthcare.  (DE 20 at 7.)  Heartland argues that the firm did more than just represent iHealthcare.  It alleges that McGuireWoods also represented *Heartland* in the transaction, despite the fact that there was no formal agreement to do so.  (DE 17 at 8-9.)  Therefore, in Heartland's view, McGuireWoods committed legal

malpractice by facilitating the transaction and failing to warn its *de facto* client (Heartland, not

iHealthcare) of the consequences of transferring assets out of company.  After winding through

the federal bankruptcy and state courts, this claim finally reached me on February 27, 2012,

when I granted McGuireWoods' motion to withdraw the previous reference to the bankruptcy

court. (DE 2.) McGuireWoods seeks dismissal of the complaint on several grounds, but I only

need to address one of its arguments.

## DISCUSSION

In order to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim

to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *accord*

*Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 555 (2007).  I must accept all factual allegations

as true and draw all reasonable inferences in the complainant's favor, but I don't need to accept

threadbare legal conclusions supported by purely conclusory statements. *See Iqbal*, 129 S.Ct. at

1949-50.  The first step in my analysis is to identify and disregard all allegations in the

Complaint that are not entitled to the assumption of truth, especially including any legal

conclusions. *Id.* at 1951.  Then I must look at the remaining allegations to determine whether

they *plausibly* – and not merely possibly or conceivably – suggest an entitlement to relief. *Id.*

This task invariably requires me to draw on my judicial experience and common sense. *Id.* at

1950.

McGuireWoods' motion to dismiss raises seven separate challenges to Heartland's

lawsuit.  They are: (1) McGuireWoods was hired to represent iHealthcare, and not Heartland, in

the transaction; (2) McGuireWoods had no duty to give business advice to its client, whomever

that was; (3) there can be no conflict of interest between a parent company (like iHealthcare) and

its wholly-owned subsidiary (like Heartland); (4) under the state law that McGuireWoods argues

-4-

should apply, there is no duty on the part of an attorney to protect the interests of creditors of an insolvent client; (5) the legal doctrine of *in pari dilecto* operates to bar recovery by Heartland for the purported misdeeds of its management; (6) Heartland's claim is time-barred; and (7) the bankruptcy trustee is not a proper plaintiff in this lawsuit.

I will decide the present motion based on the first ground that McGuireWoods raises, but before getting to that issue, a few observations are in order. Many of the other arguments raised by McGuireWoods are surprisingly complicated. Here's an example to prove the point. McGuireWoods claims that an attorney has no duty to protect the interests of creditors of an insolvent or near-insolvent entity. Whether this is accurate or not is at best fuzzy. For starters, one threshold issue in that analysis is whether Indiana or Illinois law applies (and I'll say more on the choice-of-law issue shortly). There are numerous contacts with both states, so that will be a difficult call in its own right. *See Hubbard Mfg. Co., Inc. v. Greeson*, 515 N.E.2d 1071, 1073-74 (Ind. 1987) (adopting a hybrid choice-of-law approach which first considers the jurisdiction in which the tort occurred, and then which may or may not move on to the significance of that jurisdiction's contacts with the claim). If Indiana law applies, the claim plainly fails because the state doesn't recognize a duty on the part of *anyone* to protect an insolvent company's creditors. *See Geiger & Peters, Inc. v. Berghoff*, 854 N.E.2d 842, 851 (Ind. Ct. App. 2006). Illinois law appears to be silent on this issue, so the claim *might* be cognizable in that state, depending on how I think the Illinois courts would choose between jurisdictions that recognize a limited duty (like Delaware, at least for the sake of argument, *see Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 203 (Del. Ch. 2006) (speculating that "[a]t most, one might conceive that the directors of a wholly-owned subsidiary owe a duty to the subsidiary not to take action benefiting a parent corporation that they know will render the subsidiary unable to meet

its legal obligations")) and those that don't (like Indiana).  And suppose I conclude that Illinois is likely to recognize such a duty.  Then I still would need to construe this hypothetical duty to protect the creditors of an insolvent subsidiary – which seems to come up almost exclusively in cases involving a company's managers or directors, *id.*; *In re Direct Response Media*, 466 B.R. 626, 649-50 (Bankr. D. Del. 2012) – to determine whether it should apply to attorneys.

And this is just one of seven dismissal arguments before me.  Fortunately, for the time being, I don't have to reach all of them because resolving the first issue – the threshold argument that McGuireWoods represented iHealthcare and not Heartland in the transaction – is enough to support dismissal of the case.  I'll explain why now.

## A.

Let's start by looking at Heartland's legal theory on this issue.  No one seems to dispute that the firm formally was hired to represent iHealthcare, and not Heartland.  McGuireWoods contends that this discrepancy precludes any malpractice claim by Heartland.

Before diving into the issue, there is that preliminary choice-of-law question – Illinois versus Indiana – that needs to be briefly discussed.  It is an important one because Indiana law appears to be substantially less favorable to Heartland on the underlying attorney-client relationship issue, and if it applied, Heartland would likely lose, as one recent Seventh Circuit decision underscores.  *See Rosenbaum v. White*, No. 11–3224, --- F.3d ----, 2012 WL 3517590, at *6-10 (7th Cir. Aug. 16, 2012) (holding under Indiana law that an attorney would not be deemed to represent a client even where he had actual knowledge of the events suggesting the representation).  And whether Illinois or Indiana law applies is a difficult question.  Indiana courts use a complicated hybrid choice-of-law analysis that starts with a traditional *lex loci delicti* approach, but then moves on to the more modern "most significant relationship" test if – but only if – the first jurisdiction (*i.e.*, the location of the tort) has "little connection" or

insignificant contacts to the tort claim. *See generally* David A. Moore, Note, Hubbard v. Greeson: *Indiana's Misapplication of the Tort Sections of the Restatement*, 79 Ind. L.J. 533 (2004) (explaining and criticizing Indiana's hybrid choice of law analysis).

Yet the party's briefing on the choice-of-law issue is cursory at best. Both argue in a perfunctory way that either Illinois law applies (Heartland's view of the matter) or that Indiana law applies (McGuireWoods' take on things) without much explanation and elaboration as to which jurisdiction is the place that the tort occurred, and if that's Indiana, why the state has sufficient connection to an attorney malpractice claim against an Illinois law firm operating out of Illinois. If an amended complaint is filed and a renewed motion to dismiss is brought, the choice-of-law issue needs to be addressed in a more robust way by the parties. It may be case dispositive. For now, however, I will assume without deciding that Illinois law applies.

Heartland argues that under Illinois law an attorney for a parent company can be deemed to represent that company's subsidiary where the subsidiary "expects" that it is the lawyer's client. (DE 17 at 8.) It cites a single Illinois decision, *Bd. of Mgrs. of Eleventh St. Loftiminium Ass'n v. Wabash Loftiminium, L.L.C.*, 876 N.E.2d 65 (Ill. Ct. App. 2007), in support of this assertion. That case is more complicated and less helpful to Heartland than it thinks.

First and foremost, the *Loftiminium* decision had nothing to do with a legal malpractice claim. Rather, it involved a claim that a firm was conflicted out of representing a litigant because it was concurrently representing various affiliates of the adverse party in unrelated matters. *Id.* at 67-68. It is not obvious to me that a rule designed to resolve conflicts of interest that can arise when a firm undertakes a representation adverse to its *current* client's affiliates has any applicability to a malpractice claim by a *former* client's subsidiary. Indeed, the main policy rationale at issue in *Loftiminium* – the concern that an attorney should not act in a manner that

causes "a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client [or] a former client," ILCS S. Ct. Rules of Prof. Conduct, RPC Rule 1.7 – seems inapplicable in this case.  Subsequent decisions citing and applying *Loftiminium* also seem confined to the conflict-of-interest context.  *See, e.g., Cascades Branding Innovation, LLC v. Walgreen Co.*, No. 11 C 2519, 2012 WL 1570774, at *6 (N.D. Ill. May 03, 2012).  So I have substantial doubt that the *Loftiminium* rule should even apply to a malpractice claim.

But I'll ignore that for now.  Assuming that *Loftiminium* is applicable here, the case does not broadly hold (as Heartland suggests) that an attorney will represent a client's subsidiary whenever the subsidiary reasonably "expects" it to.  Instead, relying on a nonbinding opinion from the Illinois state bar organization, the court concluded that such an implicit representation *may* exist under a particular set of circumstances:

> [S]ituations where the lawyer's work for a corporate parent involves direct contact with its subsidiaries and the receipt of [confidential or secret] information concerning the subsidiaries or situations where the client corporation and the subsidiary [or other constituent] in question have the same management group. Another situation that would require the lawyer to treat a corporate affiliate as a client is where one entity could be considered the alter ego of the other.

*Id.* at 72-73 (*quoting* ISBA Op. No. 95–15, slip op. at 4 (May 17, 1996)).  In other words, the *Loftiminium* decision holds on its face that an attorney *might* be deemed to represent a client's subsidiary in three discrete scenarios: (1) Where he or she has direct contact with the subsidiary and receives confidential or secret information about it; (2) where the client and the subsidiary have the same management group; or (3) where the client and the subsidiary could be considered to be alter egos of each other.

Heartland appears to rely on the second of these, and I'll give it the benefit of the doubt and accept that it alleges sufficient facts to show that Heartland and its parent had the same

management group.  But it's a mistake to broadly view the *Loftiminium* case to mean that an attorney *automatically* will represent a client's subsidiary whenever one of the *Loftiminium* exceptions applies.  That misses a crucial aspect of the attorney-client relationship – the consent (or at the very least, understanding) of the attorney that he or she is representing a particular client.

"The attorney-client relationship is a voluntary, contractual relationship that requires the consent of *both the attorney and client*."  *People v. Simms*, 736 N.E.2d 1092, 1117 (Ill. 2000) (emphasis added); *accord In re Chicago Flood Litig.*, 682 N.E.2d 421, 425 (Ill. 1997).  In other words, not only must the client agree to have his or her attorney act for him, but "the attorney must indicate [his or her] acceptance of the power to act on the client's behalf."  *Simon v. Wilson*, 684 N.E.2d 791, 801 (Ill. 1997); *accord Kehoe v. Saltarelli*, 786 N.E.2d 605, 612 (Ill. Ct. App. 2003) ("The attorney-client relationship is consensual and arises where both the attorney and the client have consented to the retention.").

This requirement that an attorney must consent to represent a client is perfectly consistent with the imputed or constructive representation theory announced in *Loftiminium*.  That's because the *Loftiminium* court went to great lengths to explain how the firm in the case was keenly aware of the management and structure of its nominal client and its affiliates based on its representation of the family of companies in dozens of matters over at least a seven year period. *See* 876 N.E. 2d at 73.  It observed:

> The record shows that although Arnstein has literally never represented defendant Wabash Loftominium, LLC, defendant Galleria Residential, LLC, or the individual defendants as individuals, Arnstein has been representing corporations that are related to the corporate defendants and are run by substantially the same management group consisting of the individual defendants. ...The record also shows *Arnstein has represented this management group between 1999 and 2005 in at least 60 different*

> matters, involving the services of 15 billing professionals, and generating
> $175,388.30 in fees.

*Id.* (emphasis added).  The court later reiterated that the firm had a longstanding and continuous relationship with the entire corporate family, and not merely a limited or special engagement the parent company.  *Id.* at 74-75.

This discussion can't have been an irrelevant aside.  To the contrary, the firm's understanding that it was representing an entire family of affiliated entities played a pivotal role in the decision.  Therefore, even accepting that *Loftiminium* is applicable and controlling in this case (and again, that's a pretty big leap on its own), I won't construe the decision to mean that a firm automatically represents a client's subsidiary if the two companies are operated by the same management group, regardless of whether the firm even knows that the subsidiary exists.  I read the case instead to say that representation *might* be implied at that point, depending on various other factors – including, most importantly in both *Loftiminium* and here, whether the firm is aware of the corporate structure of its client and its client's subsidiaries and understands that it effectively has been engaged to represent both entities.  Any other interpretation would lead to an absurd situation where a firm's client roster would depend not on whom it agreed to represent (even if only constructively), but instead on how its corporate clients manage their subsidiaries.

**B.**

That brings us to the final dispositive issue in the case:  Has Heartland alleged facts sufficient to plausibly show that there was an attorney-client relationship between it and McGuireWoods, specifically including facts indicating that the firm was or should have been aware of the representation?  As an initial matter, the Complaint states that "[f]rom 2004 until October of 2005, Heartland's business affairs were managed by the directors of iHealthcare through a management committee for Heartland comprised of [list of committee members]."

(DE 10 at 8.)  As I said before, I'll give Heartland the benefit of the doubt and assume that this is sufficient to allege that the iHealthcare committee managing Heartland also managed the parent company, which is one of the imputed representation scenarios discussed in *Loftiminium*.

But the question of whether Heartland has alleged enough facts to show that McGuireWoods knew or at least should have known that it was Heartland's attorney in the sale of Heartland from one parent to another is not even a close call.  That's because the Complaint says *nothing* that would allow me to conclude that McGuireWoods had or should have had the requisite understanding to make Heartland its client.

To be sure, the Complaint contains a single allegation that "McGuireWoods represented, and had an attorney-client relationship with, Heartland."  (DE 10 at 19.)  But even setting aside *Twombly* and *Iqbal* (and more on them in a second), purely conclusory[1] allegations like this have never been sufficient to survive a motion to dismiss.  *See, e.g., Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 792 (7th Cir. 1996); *Sutliff, Inc. v. Donovan Cos.*, 727 F.2d 648, 654 (7th Cir. 1984), *overruled on other grounds by Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 782 (7th Cir. 1994).

And so that takes me to plausibility.  There has been a lot of discussion among judges and law professors about the precise meaning and impact of *Twombly* and *Iqbal* and their admonition that a complaint must allege facts stating a claim that is plausible on its face.  *See, e.g., McCauley v. City of Chicago*, 671 F.3d 611, 621-25 (7th Cir. 2011) (Hamilton, dissenting) (cataloguing academic and judicial criticism).  Some judges seem to think that this means they

---

[1]        It's possible in a vacuum that the assertion that McGuireWoods "represented" and "had an attorney-client relationship" with Heartland might be interpreted as shorthand for a factual allegation that the firm expressly and affirmatively agreed to represent the company.  However, the dismissal briefing is clear that this is not how the statement is intended.  To the contrary, there is no disagreement that Heartland is claiming that the representation should be imputed as a matter of law.  That's a legal conclusion, not a factual allegation.

must disregard factual allegations that they find implausible or unbelievable, but that's not right. *See Richards v. Mitcheff*, No. 11–3227, --- F.3d ----, 2012 WL 3217627, at *2 (7th Cir. Aug. 9, 2012) ("But a judge cannot reject a complaint's plausible allegations by calling them 'unpersuasive.'"). Instead, the *Twombly/Iqbal* plausibility standard means that it is not enough to allege facts *consistent* with the asserted claim; the alleged facts affirmatively must "nudge" the claim into the realm of plausibility. *See Twombly*, 550 U.S. at 570. Put a little more concretely, "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Finally, it is important to note that more complex claims – and there can be little doubt that Heartland's imputed or constructive representation theory is a complex one – require heightened specificity. *Id.* at 405.

So what facts has Heartland alleged here to advance its story that McGuireWoods represented it in the 2005 transaction? Well, Heartland says that McGuireWoods was iHealthcare's attorney and that iHealthcare managed Heartland's affairs. That is all, and it's far from enough. These allegations tell me nothing about whether McGuireWoods knew or understood or even should have known or understood that Heartland and iHealthcare shared the same management structure and expected the firm to represent both companies in the leveraged buyout and leaseback transactions. Heartland has asserted a complicated – and to be frank, probably ambitious – legal theory through which an attorney might be imputed to represent one company despite the fact that his or her formal agreement is to represent a different one. It needs to allege specific facts showing that this claim is plausible (and not merely possible or conceivable) before I turn to the myriad of other issues present in the case. It hasn't yet, at least

with respect to the issue of McGuireWoods's consent and/or understanding of the purported representation.

Having said all of that, I recognize that Heartland might be able to allege the sort of facts that would plausibly suggest that McGuireWoods knew that it was being hired to represent both iHealthcare and Heartland.  For example, maybe through the due diligence process McGuireWoods learned that, in fact, Heartland and iHealthcare were being managed by the same group, and that the two companies essentially viewed themselves as the same entity for attorney-client purposes.  Perhaps McGuireWoods even engaged in some sort of conduct implying that the firm was aware that Heartland considered it to be its attorney.  If Heartland can allege those sorts of facts in good faith, it is free to do so in an amended complaint, and we'll proceed to the more complicated dismissal arguments raised in McGuireWoods' motion to dismiss.  But for now, the Complaint does not allege facts plausibly suggesting that an attorney-client relationship between McGuireWoods and Heartland existed, and as a result, Heartland's legal malpractice claim necessarily must fail.

## **CONCLUSION**

For the foregoing reasons, McGuireWoods' Motion to Dismiss is **GRANTED**, and Plaintiffs' Complaint is **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED**.

ENTERED: September 11, 2012.

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT