UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| **DAVID ABRAMS, not individually but solely as the Liquidating Trustee and court-appointed manager of HEARTLAND MEMORIAL HOSPITAL, LLC, and HEARTLAND MEMORIAL HOSPITAL, LLC, the Debtor, an Indiana limited liability company,** | ) ) ) ) ) ) ) | |
| | ) | **Cause No.: 2:12-021** |
| | ) | |
| **Plaintiffs,** | ) ) | **Hon. Philip P. Simon, Chief U.S. District Judge** |
| **v.** | ) ) | |
| **McGUIREWOODS LLP,** | ) ) | **Hon. Paul R. Cherry, U.S. Magistrate Judge** |
| **Defendant.** | ) | |

REPLY IN SUPPORT OF McGUIREWOODS LLP's
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

February 20, 2013

David C. Giles
Schiff Hardin LLP
233 S. Wacker Dr., Suite 6600
Chicago, IL 60606
T: 312-258-5500
F. 312-258-5600

*Attorneys for McGuireWoods LLP*

## INTRODUCTION

Over the past four years, the Liquidating Trustee for Heartland Memorial Hospital LLC has filed three complaints in three different courts against McGuireWoods LLP (plus an appeal) and still cannot state a claim. His and Heartland's response to McGuireWoods's most recent motion to dismiss again confirms that they never can do so.

Heartland's liability theory fails as a matter of law. Heartland has tried to assign to McGuireWoods a first-of-a-kind, "implied," duty of loyalty to "warn" it about a third party's alleged plan to "monetize[]" its assets. The basis for this novel duty is solely Heartland's alleged "approach[ing] insolvency." No authority anywhere ever has recognized such a claim. Nor has any authority accepted the legal principles from which Heartland has tried to fashion the claim. Heartland is asking this Court to be the first, repeatedly mischaracterizing its own allegations along the way. The Court should dismiss the amended complaint for this reason alone.

Heartland's lack of a recognized liability theory is not the only fatal problem. Heartland still cannot allege that it and McGuireWoods had an attorney-client relationship. Nor can it overcome its admission that its own management authorized the deal that supposedly harmed it. The amended complaint also is time barred on its face. And the amended complaint continues improperly to name Heartland's Liquidating Trustee as a party. For all these reasons, the Court should again dismiss the complaint—this time with prejudice.

## ARGUMENT

## I.   BOTH ILLINOIS AND INDIANA LAW BAR THIS LAWSUIT.

Heartland begins its response by continuing to insist that the Court should apply Illinois law under Indiana's choice-of law rules. (DE 40-1 at 6-8). Heartland does so without identifying any actual conflict of laws requiring such an analysis. *See Ky. Nat'l Ins. Co. v. Empire Fire & Marine Ins. Co.*, 919 N.E.2d 565, 575 (Ind. Ct. App. 2010). The only two

asserted "differences" between Illinois and Indiana law that Heartland has argued either are not differences or are irrelevant.

First, Heartland incorrectly maintains that under Illinois but not Indiana law, professional rules of responsibility can "create a legal duty" for lawyers enforceable by tort law.  (DE 40-1 at 13-14.)  Both jurisdictions actually reject this idea.  In Illinois "legal ethics may be relevant to the standard of care" (as Heartland states in its response), but "[t]he rules of legal ethics do not establish a separate duty or cause of action."  *Nagy v. Beckley*, 578 N.E.2d 1134, 1136, 1138 (Ill. App. Ct. 1991).  Illinois and Indiana law thus agree on this point.

Second, Heartland contends that under Indiana law *managers* of an allegedly insolvent wholly owned subsidiary (as Heartland describes itself) lack any duty to consider creditor interests in light of the insolvency.  (DE at 40-1 at 19.)   But according to Heartland, other jurisdictions (like Delaware) follow a different rule.  (*Id*.)

Here too there is no relevant conflict.  As explained below, no Illinois law exists on this subject one way or the other (whatever Delaware's rule may be).  And more fundamentally, McGuireWoods is not arguing that the Court should select between competing rules governing *management* duties.  Its point is that no jurisdiction anywhere—whether Indiana, Illinois, Delaware, or otherwise—has recognized insolvency as a basis for additional duties for *lawyers*. So there is no relevant conflict on this point either.

Finally, even if there were a material conflict (and there is not), the Court should reject Heartland's argument for Illinois substantive law in any event.  The argument misapplies Indiana's modified version of the *lex loci delicti* conflicts test.  Heartland does not assert that Indiana "bears little connection" to its claim.  Accordingly, the Court should apply the law of the jurisdiction where the alleged wrong occurred.  (DE 34 at 8 (citing cases).)  That jurisdiction is

"where the last event necessary to make an actor liable for the alleged wrong takes place."  (*Id.*) Heartland maintains that here the alleged "tort occurred" in Illinois because McGuireWoods performed services in Illinois and "that state's law supplies the standard of performance and that is where the client *normally* would suffer injury."  (DE 40-1 at 8 (quoting *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) (emphasis added).)  But "normally" is not "always," and this case reflects the exception.

As the Seventh Circuit emphasized in *Bridgestone/Firestone*, "Indiana is a *lex loci delicti* state:  in all but exceptional cases it applies the law of the place *where harm occurred*."  288 F.3d at 1016-17 (emphasis added).  Here the alleged harm undisputedly occurred in Indiana; Heartland fails to argue otherwise.  Heartland organized itself under Indiana law, maintained its principal place of business in Indiana, and allegedly suffered injury in Indiana through "monetization" of real estate for six medical practices, all but one of which sat and operated in Indiana.  (DE 34 at 8; DE 25 ¶¶ 38, 48.)  "The *lex loci delicti* principle points to the places of these injuries."  *Bridgestone/Firestone*, 288 F.3d at 1016.  Indiana law therefore would apply in the event that the Court had to decide this issue (which it does not).  That McGuireWoods allegedly performed legal work in Illinois, as Heartland argues, is not the relevant contact.  What matters is where the harm allegedly occurred.

## II.      HEARTLAND CANNOT STATE A LEGAL-MALPRACTICE CLAIM.

Heartland's response on the merits confirms that it cannot "state a claim to relief that is plausible."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation omitted).  Heartland's liability theory is unrecognized, and it cannot allege the attorney-client relationship required to state a legal-malpractice claim.  Both problems are irremediable.

### A.   Heartland Cannot Allege That McGuireWoods Breached Any Duty.

"[T]he most basic obstacle" to Heartland's amended complaint remains that it cannot allege a recognized duty of care or loyalty that McGuireWoods supposedly breached.  (DE 34 at 24.)  The amended complaint lacks any allegations at all about the duty of care.  Heartland's theory is not that McGuireWoods carelessly drafted a document, improperly structured the "sale of equity" merger between iHealthcare and Wright Capital Partners LLC, or provided any other incorrect legal advice.  And Heartland's effort to cast its amended complaint in terms of a breach of loyalty fails.  This problem is insurmountable.

### 1.   *Lawyers have no duty to "warn" insolvent wholly owned subsidiaries about risks to their assets from a third party's financing transaction.*

Heartland's claim rests on alleged misuse of its assets to pay part of the consideration for Wright Capital's purchase of iHealthcare.  Heartland maintains that it was starved for cash in 2005 and that its then management (which it calls "Old Management") was soliciting new investors or a merger partner as a possible solution.  (DE 25 ¶ 23.)  The Old Management found a potential buyer in Wright Capital, which infused $2.5 million into Heartland in October 2005. (*Id.* ¶ 28.)  Wright Capital then purchased iHealthcare's stock through a merger five months later for $25 million in cash and other consideration.  (*Id.* ¶¶ 30-32.)  To finance the merger, Wright Capital allegedly caused Heartland to sell real estate for some of its medical practices for $18 million to "AIC Holding V, LLP."  (*Id.* ¶¶ 33, 36-40.)  Heartland then leased the sold property back for $163,000 per month.  (*Id.* ¶ 38.)  Of the $18 million generated from the AIC sale-leaseback, Wright Capital supposedly allocated $7.3 million to the $25 million total merger consideration that it paid for iHealthcare's stock.  (*Id.* ¶¶ 35, 40.)

Heartland does not argue that Wright Capital's decision to use this sort of leveraged financing was inherently improper.  A company's assets (or those of a subsidiary) commonly are

pledged to raise cash to pay for an ownership interest in the leveraged company. *E.g.*, Tom Alblum & Mary Beth Burgis, *Leveraged Buyouts: The Ever-Changing Landscape*, 13 DePaul Bus. Law J. 109 (2001). Heartland claims that McGuireWoods should have stopped the deal simply because the deal benefited Heartland's "constituents"—namely its parent, iHealthcare, the Old Management, and iHealthcare's selling shareholders—at Heartland's expense. Thus, Heartland claims that "McGuireWoods' job was to protect Heartland's interest and no one else's, regardless of what the constituents of the organization (its officers, directors and corporate parent) wanted them to do." (DE 40-1 at 15.)

This contention is unsupportable. Heartland fails to contest that it was a wholly owned subsidiary and that it accordingly would have existed under normal circumstances solely for the benefit of its owner, iHealthcare, and its owner's shareholders. (DE 34 at 22-24.) Nor does Heartland dispute that for this reason, its claim of "divided loyalty" between it and its "constituents" normally would be frivolous. (*Id*.) It argues that its situation parted from the normal one only because it was "approach[ing] insolvency." (DE 40-1 at 18.) This "near[]" insolvency, Heartland insists, allegedly "heightened the lawyers' duty." (DE 40-1 at 16, 18-19.)

No authority anywhere has accepted this theory. None has suggested that a wholly owned subsidiary's "approach[ing] insolvency" affects a lawyer's professional obligations or supports legal-malpractice liability. (DE 34 at 24-25.) At most, some jurisdictions have suggested that company *management*—in this case the Wright Capital managers who arranged the AIC sale leaseback—may acquire additional duties because of the company's alleged insolvency. (*Id*.) But no authority ever has applied this principle to company *lawyers*.

Heartland fails to acknowledge much less dispute this point. In the lone two paragraphs on this key issue in its response, Heartland cites only cases stating that "*directors*" of a wholly

owned subsidiary "approach[ing] insolvency" cannot under certain circumstances "benefit the parent company" at the subsidiary's expense.  (DE 40-1 at 18-19 (emphasis added) (citing cases suggesting that the "directors" also may have to consider creditors' interests in addition to the parent's).)  (*Id.*)  But McGuireWoods never held a "directors" position at Heartland, and Heartland supplies no reason why this Court should be the first to extend cases dealing with company management to alleged company lawyers.  It just ignores the problem.

Nor is there a reason to break new ground here.  First, the alleged management duty that Heartland would have the Court expand (without explaining why) itself is hopelessly "muddled."  J. Haskell Murray, *"Latchkey Corporations:" Fiduciary Duties in Wholly Owned, Financially Troubled Subsidiaries*, 36 Del. J. Corp. L. 577, 582, 587 (2011) ("It understates the obvious to say that to whom *directorial fiduciary duties* run during insolvency is an issue subject to considerable debate and confusion." (emphasis added)); *see In re Bostic Const., Inc.*, 435 B.R. 46, 62 n.3 (Bankr. M.D.N.C. 2010) ("[c]ommentators are divided" about management duties under these circumstances); *ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 395 (S.D. Tex. 2008) ("some difference of opinion" on the subject); *see also CML V, LLC v. Bax*, 6 A.3d 238, 253 (Del. Ch. 2010) *aff'd*, 28 A.3d 1037 (Del. 2011) (calling the original justification for such duties "largely discredited and abandoned").  Among other things:

- Some jurisdictions—like Indiana—reject any additional management duties upon insolvency altogether, as the Court already has recognized.  *See* DE 21 at 5 and DE 34 at 25 (Indiana law); Haskell, 36 Del. Corp. L. at 587 nn. 28-29 (collecting cases applying Ohio, Indiana, North Carolina, Delaware, and California law).

- Other courts have recognized additional management duties as a result of purported insolvency but disagree whether the duties run to creditors or the subsidiary itself.  *Compare Jetpay Merch. Services, LLC v. Miller, CIV.A.* 3:07CV0950-G, 2007 WL 2701636 (N.D. Tex. Sept. 17, 2007) (to creditors under Colorado law), *with N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007) (to the subsidiary under Delaware law).

- Other courts have recognized additional management duties but disagree *when* these duties arise, debating whether the trigger is an "approach[] [to] insolvency," as Heartland here alleges, or actual insolvency. *Compare In re VarTec Telecom, Inc.*, 2007 WL 2872283, at *3 (Bankr. N.D. Tex. Sept. 24, 2007) ("zone of insolvency" sufficient), *with Gheewalla*, 930 A.2d at 101 (actual insolvency required).

- Still other courts have recognized additional management duties but disagree *who* can sue to enforce the alleged duties. *E.g., Bax,* 6 A.3d 238 at 254 (no derivative standing for creditors of a limited-liability company).

For its part, Illinois courts have in some cases recognized that managers of a corporation may consider creditor interests during insolvency under the "trust fund doctrine." *Workforce Solutions v. Urban Services of Am., Inc.*, 977 N.E.2d 267, 284 (Ill. App. Ct. 2012). But none has addressed whether such management obligations can arise as to a wholly owned subsidiary like Heartland. Nor has any Illinois authority required a wholly owned subsidiary's managers to depart from the normal rule that they owe duties only to the ultimate parent company. So just with respect to possible added *management duties* for wholly owned subsidiaries "approach[ing] insolvency," there is no Illinois authority, Indiana authority rejecting the idea, and a range of views in other jurisdictions. And Heartland fails to address the distinction between management and lawyers at all. Given this state of affairs, there is no reason to fashion a new liability scheme in this case for *lawyer duties* from such an unsettled body of inapplicable corporate law.

Second, Heartland's theory lacks any justification because the theory would require lawyers to learn details of their clients' finances that no court has recognized. (DE 34 at 25.) One of the reasons that many jurisdictions reject even management duties in the event of insolvency is that insolvency is hard to identify. *Berg & Berg Enters., LLC v. Boyle*, 100 Cal. Rptr. 3d 875, 894 (Cal. App. Ct. 2009) ("We also perceive practical problems with creating such a [management] duty, among them a director's ability to objectively and concretely determine when a state of insolvency actually exists such that his or her duties to creditors have been

triggered.").  If questions abound whether managers should appreciate the insolvency of their own businesses, the law cannot demand more from outside counsel.

Third, minting additional lawyer obligations as a result of a wholly owned subsidiary's "approach[ing] insolvency" would conflate basic roles and competencies that business managers and asserted outside lawyers possess.  Company managers—not company outside lawyers—have the training, experience, and responsibility to make company decisions—like iHealthcare's decision to merge with Wright Capital and Wright Capital's decision how to finance that merger. *E.g., Ill. Armored Car Corp. v. Indus. Comm'n*, 563 N.E.2d 951, 955 (Ill. App. Ct. 1990) ("Decisions relating to a corporation's financial obligations are typically reserved for corporate officers and directors, not for attorneys representing the corporation."); *Powell v. W. Ill. Elec. Coop.*, 536 N.E.2d 231, 234  (Ill. App. Ct. 1989) ("[W]e begin by recognizing the principle that corporate decisions are the responsibility of the board of directors.").  These management decisions in turn receive protection to foster decision-making.  That protection includes the business-judgment rule (for corporations) and statutory exculpatory provisions (for limited-liability companies like Heartland).  *See In re Amcast Indus. Corp.*, 365 B.R. 91, 105 (Bankr. S.D. Ohio 2007) ("[T]he business judgment rule applies in insolvency.").

Here, for example, exculpatory statutes would have blocked Heartland from suing its management for negligence on the same theory now proposed against McGuireWoods: neglecting to "warn" it about alleged "monetize[ation]" of its assets in the AIC sale-leaseback that Wright Capital arranged.  Both the Illinois and Indiana Limited Liability Company Acts would bar an ordinary negligence claim against Heartland's management on this theory.  The statutes instead would require Heartland to show at least gross negligence, recklessness, or "knowing violation of law."  805 ILCS 180/15-3(c); Ind. Code Ann. § 23-18-4-2(a).  Given this

heightened standard for management, there is no justification for a legal-malpractice theory that would permit Heartland to sue McGuireWoods for the same alleged wrong on a lower showing. Yet that result is what Heartland's unprecedented liability theory would allow.  There simply is no support for Heartland's claim and no reason to recognize it.

### 2.    *Heartland's overstatement of its own allegations adds nothing.*

Because Heartland lacks any authority for its liability theory, its response tries to dress its complaint in fanciful hyperbole that the amended complaint fails to support.  (DE 40-1 at 15-19 (calling the leveraging of its assets in the AIC sale-leaseback "looting," "plundering," and "self-dealing").)  There is no claim in the amended complaint, for example, of fraud, conspiracy, "aiding and abetting," or other intentional wrong.

This case accordingly is doubly unlike the cases on which Heartland relies—none of which dealt with wholly owned subsidiaries but all of which involved fraud or other willful misconduct.  *E.g.*, *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 768-69 (Ill. App. Ct. 2003) (lawyers allegedly aided and abetted a client's fraud and fiduciary breach through fraud); *Clark v. Allen*, 1998 WL 110160, at *1 (4th Cir. 1998) (non-precedential) (lawyers allegedly helped an insolvent insurance company pay premiums to sham corporations that they controlled and sold stock in the insurer's parent to those entities at substantially less than fair value); *Lincoln Savings & Loan Assoc. v. Wall*, 743 F. Supp. 901, 919-20 (D.D.C. 1990) (continuing a receivership because a financial institution's fraudulent transactions justified the receivership).

Nor is this case like *Wilner's Fuel Distributors, Inc. v. Noreen*, 882 P.2d 399 (Alaska 1994), which Heartland also cites.  There a lawyer had to hold client assets for the benefit of creditors due to the client's insolvency because the lawyer held the assets in his client trust-fund account.  *Id*. at 306 (reasoning that a lawyer has a duty to protect client funds "in his or her custody").  Heartland has no claim that McGuireWoods ever had "custody" of its funds.

Heartland's "self-dealing" rhetoric falls flat.  The events alleged in the amended complaint disprove this label.  The misleading leap throughout Heartland's response is that "[t]he transactions at issue here were designed and carried out by Heartland's insiders to strip it of cash when it was insolvent (or nearly so)."  (DE 40-1 at 20.)  This statement is not what Heartland has alleged.  Heartland has failed to assert—and could not assert—that its "insiders"—meaning its "Old Management" or iHealthcare's other selling shareholders—"designed" or "carried out" Wright Capital's financing to buy their iHealthcare stock.  Heartland instead correctly has acknowledged that Wright Capital arranged the AIC sale-leaseback and that Wright Capital's lawyers at DLA Piper—not McGuireWoods—represented Heartland in the AIC deal.  (DE 25 ¶ 36; DE 14 Ex. 2 ¶¶ 99-100.)  There is no allegation that iHealthcare or its selling shareholders were a party to the AIC sale-leaseback, that they or McGuireWoods had any responsibility for selecting this method of financing, or that financing methods even were provided for in the merger document that the selling shareholders signed (which they were not).  (*See* DE 34 at 3.)  All that Heartland alleges in the amended complaint is that McGuireWoods and the selling shareholders "knew or should have known" the terms of the AIC sale-leaseback—not that they "designed" or "carried out" this sale-leaseback "to strip it of cash."  (DE 25 ¶¶ 41, 50.)

In its response Heartland tries imprecisely to lump "the transactions at issue" in this case and the "insiders" into one group (irrelevantly adding that the merger and sale-leaseback transactions supposedly occurred "contemporaneously").  (DE 40-1 at 18, 20.)  But the distinction between the alleged conduct of the sellers and their counsel and the buyer and its counsel is critical.  Heartland cannot accuse either the sellers or the buyer of "self-dealing" or their lawyers of "fascilitat[ing]" the "self-dealing" if the beneficiaries of the alleged "self-dealing" lacked responsibility for how Wright Capital chose to pay them.  *Compare In re JTS*

*Corp.*, 305 B.R. 529, 551-52, 554-55 (Bankr. N.D. Cal. 2003) (lawyers and a company manager responsible for corporate opportunities that the manager directly seized).  Heartland has not asserted fraud, concerted action, or another supposed basis to make the selling shareholders or McGuireWoods responsible for Wright Capital's financing decisions. Wright Capital made its own decision to leverage the assets of the company that it was buying to finance the purchase.

For this reason, Heartland's amended complaint remains about no more than an allegedly bad business decision.  The relationship between the selling shareholders, Wright Capital, and their respective outside counsel precludes Heartland from complaining against McGuireWoods about how Wright Capital financed the "sale of equity" merger.  But even putting that problem aside, the claimed "wrong" here is only that Heartland should have avoided entering into the AIC sale-leaseback to start.  That "wrong" is no more a basis for lawyer liability than the ones that courts routinely have rejected in the cases cited in McGuireWoods's opening brief.  *E.g.*, *Maxwell v. KPMG LLP*, 520 F.3d 713, 716 (7th Cir. 2008) (involving failure to advise against "acuir[ing] another company"); *In re Greater Se. Cmty. Hosp'l Corp.*, 333 B.R. 506, 529-30 (Bankr. D.D.C. 2005) ("failure to inform" management "of the 'consequences' of deepening insolvency); *Lamb v. Barbour*, 455 A.2d 1122, 1126 (N.J. Super. 1982) ("failure to discourage" a risky transaction); *see also Kan. Pub. Empl. Ret. Sys. v. Kutak Rock*, 273 Kan. 481, 489, 44 P.3d 407, 413 (2002) (failure to warn against an allegedly imprudent investment).  As in these cases Heartland seeks to add McGuireWoods as an additional "insurer . . . of a business decision . . . unrelated to what an [attorney] is hired to do."  *Maxwell*, 520 F.3d at 717.  No authority supports this result, regardless of Heartland's alleged "approach[ing] insolvency" or otherwise.

**B.    Heartland Cannot Allege An "Implied" Attorney-Client Relationship.**

That McGuireWoods lacked any duty to "warn" Heartland about potential "monetization" of its assets also explains why the amended complaint cannot allege an "implied"

attorney-client relationship.  Because McguireWoods lacked any such duty, it makes sense that Heartland has failed to allege (and cannot allege) that it looked to McGuireWoods to discharge the duty or that McGuireWoods agreed to do so.

Heartland does not dispute that to have an "implied" attorney-client relationship it must allege "a true contract, containing all necessary elements of a binding agreement."  (DE 34 at 10.)  The elements of such a "deal" include "authorization," "consent," a "meeting of the minds," and a "clear intent" for McGuireWoods "concurrently" to represent Heartland along with iHealthcare.  (*Id.* at 10-12; *see also* DE 40-1 at 12 (Heartland's conceding that it must assert both that it "manifest[ed] to" McGuireWoods its intent to obtain legal services and McGuireWoods's "manifest[ation] of consent to do so" (quoting Restatement (Third) of the Law Governing Lawyers § 14)).  Nor does Heartland contest that where—as here—the claim is that "an attorney has failed to advise a client, the client must allege that the scope of representation sought by the client included the advice that the defendant failed to give."  (DE 34 at 17 (quoting *Dahlin v. Jenner* & *Block, LLC*, No. 01 C 1725, 2001 WL 855419, at *5 (N.D. Ill. Jul. 26, 2001)).)

Heartland ignores these rules.  It makes no argument that it sought from McGuireWoods or McGuireWoods agreed to provide a "warn[ing]" about Wright Capital's decision to "monetize[]" its assets or any advice generally about how to protect its assets in the "sale of equity" merger.  Nor do its allegations plausibly suggest its required "authorization" for McGuireWoods to provide advice on these subjects or McGuireWoods's "consent to do so."

Heartland instead focuses on two different allegations from its amended complaint.  First, it emphasizes that McGuireWoods supposedly advised Heartland's and iHealthcare's "joint committee" about certain of Heartland's unspecified "tax liabilities" as well as "how Heartland's licenses would be impacted by the Wright Capital transaction."  (DE 40-1 at 9-11; DE 25

¶ 47(d), (e).)  Second, it points to its allegation that this committee supposedly "treated the two companies [iHealthcare and Heartland] as a single entity" and "entered into major financial transactions" involving both entities.  (*Id*.)

Neither of these contentions—nor anything else that Heartland has alleged—suffice. These allegations fail to hint at a request for or agreement to provide "warn[ings]" about possible "monetize[ation]" of Heartland's assets or advice about how to protect its assets generally.  The amended complaint's disconnect between the alleged "scope of representation sought by the client" and the claimed "advice that the defendant failed to give" accordingly persists.

Moreover, even without this fatal disconnect, Heartland's contentions still would fail to suggest a plausible "implied" attorney-client relationship.  First, the claimed advice about "tax liabilities" and "licenses" adds nothing.  Heartland is not complaining that there was anything wrong with this advice.  Nor does Heartland allege that the joint committee requested or that McGuireWoods agreed to provide this advice on *Heartland's* behalf or for *its* benefit.  Instead, the only plausible inference is that the alleged tax liabilities and licenses came up as part of McGuireWoods's agreement to represent iHealthcare.  (DE 34 at 11-12 (explaining that Heartland "says as much" by admitting that McGuireWoods "negotiated over" the taxes "with Wright's attorneys at DLA Piper" as part of the "sale of equity" and that the "impact[]" of the licenses likewise concerned the "Wright Capital transaction" (quoting DE 25 ¶ 47(d), (e)).) Heartland neglects to address or contest these points in its response.

Heartland's allegation that iHealthcare's and Heartland's joint committee "treated [them] as a single entity" is equally unavailing.  This allegation in no way implies "authorization" for McGuireWoods to advise Heartland independently or McGuireWoods's "consent to do so." Heartland argues in response only that this "functionally one entity" allegation "alone is

- 13 -

sufficient." (DE 40-1 at 13.) It then adds that from this alleged fact "McGuireWoods knew or should have known that Heartland would expect that it was representing its interests." (*Id.*)

Heartland cites no authority for its "alone is sufficient" claim. And as for what McGuireWoods "knew or should have known," both Illinois and Indiana reject this alleged basis for implying an attorney-client relationship. Whatever the relevance of an organization's supposed "extensive common ownership and management" or the applicability of the disqualification decision that Heartland touts in *Bd. of Managers of Eleventh St. Loftominium Ass'n v. Wabash Loftominium, L.L.C.*, 876 N.E.2d 65 (Ill. App. Ct. 2007), "[t]he allegation that [the lawyer] should have known he was expected to protect the [putative client] is an allegation which places upon him a duty not imposed by law. Even if, as alleged, he knew of those expectations, that would not necessarily have imposed a duty which he would owe to a client." *Felty v. Hartweg*, 523 N.E.2d 555, 557 (Ill. App. Ct. 1988); *see also* DE 21 at 6 (explaining that under Indiana law "an attorney would not be deemed to represent a client even where he had actual knowledge of the events suggesting the representation"). Heartland's amended complaint thus cannot state a claim for this reason either. *Dahlin*, 2001 WL 855419 (Rule 12(b)(6) dismissal with prejudice on this basis).

### III.    THE *IN PARI DELICTO* DOCTRINE BARS THIS LAWSUIT.

Heartland's unviable negligence theory also results in another fatal pleading problem. In attempting to task McGuireWoods with duties belonging at most to its management, Heartland concedes that its management authorized and encouraged the sale-leaseback that supposedly caused it harm. (DE 34 at 25-27.) This admission bars its amended complaint. Heartland admittedly was "in equal fault" (or *in pari delicto*) with any alleged wrongdoing.

Heartland has identified only one ground on which to try to avoid this bar. It contends that its management allegedly acted "adversely" to it and therefore it should not bear

- 14 -

responsibility for management's decisions.  (DE 40-1 at 20-24.)  But putting aside whether this claim of "adversity" is even true, "adversity" alone is not enough.  Where company management allegedly acts in its own self-interest, the company remains responsible unless management "totally abandoned" the company interest and acted "solely" for its own benefit.  *E.g.*, *McRaith v. BDO Seidman, LLP*, 909 N.E.2d 310, 336 (Ill. App. Ct. 2009) (applying the adverse-interest doctrine because "the record does not demonstrate that the insurance companies benefited from [the agent]'s wrongdoing"); *In re CBI Holding Co., Ins*., 311 B.R. 350, 369 (S.D.N.Y. 2004) ("The adverse interest exception is a narrow one; for it to apply, the agent must have totally abandoned his principal's interest and be acting solely for his own or another's purpose.").

Unlike the cases on which Heartland relies, the complaint here establishes that Heartland received benefits from the AIC sale-leaseback about which it is complaining.  Heartland acknowledges that it was "desperate" for cash before the sale-leaseback and merger.  (DE 40-1 at 3; DE 25 ¶¶ 25, 28.)  It also concedes that these transactions relieved its cash shortage.  (*Id*.)  Wright Capital immediately infused $2.5 million into the business in October 2005, and that infusion allegedly allowed Heartland "to continue to operate."  (DE 25 ¶¶ 25, 28-29.)  The sale-leaseback five months later generated another $18 million, of which Heartland retained over $10 million.  (*Id*. ¶¶ 30, 39-40.)  There accordingly is no set of facts on which it could allege that these transactions "solely" benefited its management or that management "totally abandoned" its interests.  The transactions generated substantial cash for Heartland itself when it needed cash. *E.g.*, *Nisselson v. Lernout*, 469 F.3d 143, 155 n.4 (1st Cir. 2007) (a positive effect on the "immediate interests of the party" defeats the "adverse interest exception" regardless of the party's "subsequent implosion"); *In re Scott Acquisition Corp*., 364 B.R. 562, 568 (Bankr. D. Del. 2007) ("Because the Debtors received *some* benefit from the Insiders' actions, the adverse

interest exception does not apply, and the acts of the Insiders are therefore imputed to the Debtors."); *In re Amerco Derivative Litig.*, 252 P.3d 681, 696 (Nev. 2011) (same).

These admissions also refute Heartland's assertion that "imputation and *in pari delicto* are fact-specific defenses" unsuited to a motion to dismiss. (DE 40-1 at 19.)  Although courts cannot assume contested facts relevant to an *in pari delicto* defense on a motion to dismiss, *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 597 (7th Cir. 2012), the Court can resolve the defense on a motion where "the facts thoroughly alleged in the complaint" show that the defense applies, *Knauer v. Jonathon Roberts Fin. Group, Inc.*, 348 F.3d 230, 237 (7th Cir. 2003).  In this respect this case is unlike *Peterson* and like *Knauer.*  In *Peterson* a bankruptcy trustee pleaded around the defense by alleging that management remained unaware of a Ponzi scheme. 676 F.3d at 597.  In *Knauer* a receiver pleaded into the defense by conceding the facts necessary to establish the defense in its complaint.  Here Heartland has done the same thing by (i) acknowledging that its management encouraged the sale-leaseback about which it complains and (ii) conceding that it benefited from the deal.

Finally, there is no merit to Heartland's contention that an "innocent trustee" is immune from *in pari delicto* principles.  (DE 40-1 at 21-23.)  First, as explained below, Heartland's Liquidating Trustee was not the correct party to bring the claims in this case as some "successor" to Heartland.  Heartland is the only proper plaintiff, and there is no dispute that the *in pari delicto* doctrine applies to *it*.  Second, the Seventh Circuit in *Peterson* recently rejected this argument.  The Seventh Circuit stated that both state and federal law "would allow the defense" against a trustee in a suit "under state law" as well as federal.  676 F.3d at 597-98.

To be sure, *Peterson* also acknowledges that Illinois "has limited the defense on public policy grounds in some circumstances." 676 F.3d at 598 (citing *McRaith* and *Albers v.*

*Continental Ill. Bank & Trust Co.,* 17 N.E.2d 67 (1938), which dealt with a bank receivership). But none of those circumstances are present here. The Illinois "public policy" exception arises where a receiver for an insurance company or other entity appointed outside bankruptcy uses administrative powers conferred under non-bankruptcy law to bring claims while winding up a business. *E.g.*, *McRaith*, 391 Ill. App. 3d at 618-23 (Illinois Director of Insurance as receiver for failed insurance companies); *see also FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995) (the FDIC as receiver for failed savings and loans appointed under federal law); *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995) (court-appointed receiver at the SEC's request).

The Liquidating Trustee is not such a party. He was appointed by the bankruptcy court and invokes only his alleged powers under the Bankruptcy Code as a justification for his presence in this case (as discussed in Part V below). Under these circumstances, *Peterson* controls—not state-law "public policy" applied to non-bankruptcy liquidators, nor *Yessenow v. Executive Risk Indemnity, Inc.*, 953 N.E.2d 433 (Ill. App. 2011), which dealt with construction of an insurance policy. *Id*. at 442. Under the Bankruptcy Code and *Peterson*, the Liquidating Trustee would have no greater claim than Heartland, whose claim is barred by this defense.

## IV.    THE AMENDED COMPLAINT IS TIME BARRED.

Heartland's response brief also confirms that the complaint in this case is untimely. Only through a dizzying and meritless patchwork of statutory and common-law accrual, tolling, and time-computation rules does Heartland attempt to extend a two-year statute of limitations for more than five and a half years:

- First, Heartland relies on the "discovery rule" to delay accrual of the statute from March 24, 2006 (when the Wright Capital merger occurred) to January 20, 2007 (when Heartland entered bankruptcy). (DE 40-1 at 24.)

- Next, Heartland invokes the two-year bankruptcy tolling rule, 11 U.S.C. § 108(a), to try to halt the statute until March 2, 2009 (two years after the "order for relief" in the bankruptcy case). (*Id*.)

- Then, Heartland invokes a local Illinois banking holiday—"Casimir Pulaski Day"—to try to extend the statute until March 3, 2009 (when Heartland finally filed its state-court complaint). *See* 205 ILCS 630/17(a) (listing legal holidays in Illinois "upon which day a bank may, but is not required to, remain closed").

- Finally, Heartland insists that its dismissed state-court case "equitably tolled" the statute for another two years, seven months, and two days, taking it to October 5, 2011 (when it filed this action). (DE 40-1 at 26-28.)

There are numerous gaps in this sequence. First, 11 U.S.C. § 108(a) is inapplicable. Even if that statute applies to liquidating trustees as well as Chapter 7 or 11 trustees, the state court held that the Heartland's Liquidating Trustee lacked any claims to bring. Only Heartland itself could sue on legal-malpractice claims, and it did not do so. It requested to join the state case through an amendment to the complaint only after the complaint was dismissed, and the state court never granted that request. (DE 14 Ex. 5.)

Second, Heartland cannot rely on Casimir Pulaski Day, when some but not all Illinois courts are closed. The state court held that Heartland needed to file its lawsuit in this district's bankruptcy court, which unquestionably was open on Casimir Pulaski Day. The complaint was due in the bankruptcy court on March 2, 2009. Its filing the following day in state court therefore came too late. *See* Fed. R. Bankr. P. 9006(a) (listing holidays that extend filing deadlines in the bankruptcy courts).

Third, equitable tolling is unavailable. To begin with, Heartland cites no authority holding that the two-year extension in 11 U.S.C. § 108(a) is even subject to further tolling. *E.g.*, *In re Verilink Corp.*, 457 B.R. 832, 836 (N.D. Ala. 2011) (concluding that such "an extension of an extension . . . must be denied"). Heartland also cites no authority that the common-law rule of equitable tolling trumps the Illinois savings statute. (DE 34 at 28-29.) It cites only *Block v. Pepper Const. Co.*, 710 N.E.2d 85, 90 (Ill. App. Ct. 1999), *Clay v. Kuhl*, 727 N.E.2d 217 (Ill. 2000), and the non-precedential decision in *Granger v. Rauch*, 388 F. App'x 537, 543 (7th Cir.

- 18 -

2010).  (DE 40-1 at 28.)  But *Block* and *Clay* did not involve filing in the wrong forum as an alleged basis for tolling.  Nor did any of these decisions hold that equitable tolling will save a time-barred claim where the savings statute will not.

To the contrary, *DeClerck v. Simpson*, 577 N.E.2d 767, 768 (Ill. 1991) provides that what types of dismissal qualify for tolling "is an issue for the legislature."  577 N.E.2d at 777. According to the Illinois legislature, the "common law prevails" only "as to all matters not regulated by statute or rule of court."  735 ILCS 5/1-108(c); *Hawes v. Luhr Bros., Inc.*, 816 N.E.2d 345, 352-53 (Ill. 2004) ("The clear implication [of section 1-108 of the Code] is that the Code, to the extent that it regulates procedures, takes precedence over the common law."). Heartland thus cannot rely on common-law tolling to override the conceded statutory result.

What is more, Heartland's common-law equitable-tolling argument is incompatible with equitable tolling's purpose in any event.  The purpose of equitable tolling is to "deal[] with situations in which timely filing is not possible *despite diligent conduct*."  *Farzana K. v. Ind. Dept. of Educ.*, 473 F.3d 703, 705 (7th Cir. 2007) (emphasis added).  On this standard, filing in the wrong forum *could* in theory justify common-law tolling in unusual cases of "wrong forum" filing.  *E.g.*, *Doherty v. Teamsters Pension Trust Fund*, 16 F.3d 1386, 1394 (3d Cir. 1994) ("extreme duress caused by the illness and death of the lawyer during the proceedings").

But otherwise "even reasonable mistakes of law are not a basis for equitable tolling." *Williams v. Sims*, 390 F.3d 958, 963 (7th Cir. 2004).  And here there is not such a mistake.  It is undisputed that Heartland's and the Liquidating Trustee's own lawyers drafted the jurisdictional provisions of Heartland's Chapter 11 plan.  Those provisions have now been examined by two courts—the state court and the bankruptcy court.  Both courts have concluded that as originally written, the plan *unambiguously* precluded the Liquidating Trustee from suing in state court.

(DE 14 Ex. 4 & 5; DE 17 Ex. C at 15, 18.)  This case accordingly is not one where Heartland or the Liquidating Trustee legitimately could claim a "reasonable mistake of law" (which itself is not enough) in selecting the "wrong forum."

Heartland knew or certainly should have known the right forum in which to begin this case.  For whatever reason, it elected to disregard the language that its own lawyers had written. That conduct leaves no room for equitable tolling to allow untimely litigation against an innocent party like McGuireWoods.  McGuireWoods had nothing to do with the mistaken choice of forum.  *E.g.*, *Hoosier Bancorp v. Rasmussen*, 90 F.3d 180 (7th Cir. 1996) ("[T]here is absolutely no authority for tolling a statute of limitations while a party takes unnecessary legal action, regardless of whether that action was taken in good faith. . . . [Equitable tolling] does not provide aid to those plaintiffs who fail to research the requirements of bringing a lawsuit."); *see Johnson v. McCaughtry*, 265 F.3d 559, 566 (7th Cir. 2001) (mistaken selection of the wrong forum not a ground for equitable tolling); *Farzana*, 473 F.3d at 706 (stating that the remedy under such circumstances lies with the party making the mistake and "not the continuation of litigation against an adversary who played no role in the error").  Heartland's claims are barred.

## V.     HEARTLAND RETAINED ALL MALPRACTICE CLAIMS.

The Liquidating Trustee also is not a proper plaintiff, as the state court held.  There is no dispute that Heartland retained all malpractice claims under its bankruptcy plan of reorganization and that the plan failed to transfer any of those claims to the liquidating trust.  (DE 17 Ex. A § 3.1.)  Nor does the Liquidating Trustee argue that he is a proper party just because he is an agent or representative for a proper plaintiff.  Instead, the Liquidating Trustee maintains only that under 11 U.S.C. § 1123(b)(3), he can bring claims as Heartland's "manager" and "designated representative."  (*See* DE 17 at 23-24 (citing *In re Jennings*, 378 B.R. 678, 681 (Bankr. M.D. Fla. 2006) and *In re Amarex, Inc.*, 96 B.R. 330, 334 (W.D. Okla. 1989)).)

Section 1123(b)(3) provides that a Chapter 11 plan may identify any claim for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose." But Heartland's plan nowhere provides for the Liquidating Trustee to "retain and enforce" legal-malpractice claims. On the contrary, Heartland's plan states: "The Plan proponents believe, for example, that certain malpractice claims against attorneys cannot be transferred to the Liquidating Trust. These assets *will remain with the Reorganized Debtor*." (DE 17 Ex. A § 3.1 (emphasis added).) Thus, Heartland (as the "Reorganized Debtor") and not the Liquidating Trustee (as a "representative of the estate appointed for such purpose") was the party designated to "retain and enforce" the claims in this case.

The *Jennings* and *Amarex* cases that the Liquidating Trustee exclusively relies on illustrate this distinction. In those cases the bankruptcy court actually authorized third parties (a creditor in *Jennings* and a successor by merger to the reorganized debtor in *Amarex*) to "retain and enforce" the debtor's litigation claims. *Jennings*, 378 B.R. at 684 (holding that "[i]n order to bring an action that belongs to a bankruptcy estate . . . [the 'designated representative'] must have been expressly authorized by the Court to assert the claim"); *Amarex*, 96 B.R. at 334 (stating that the plan in that case "clearly establishes that [the 'designated representative'] is appointed to prosecute actions such as the one at bar").

Here no comparable "express" or "clear" authorization in the plan or otherwise occurred. Heartland's Chapter 11 plan provided for *it* to "retain and enforce" malpractice claims—not the Liquidating Trustee "appointed for such purpose" under 11 U.S.C. § 1123(b). The Liquidating Trustee therefore cannot sue.

## CONCLUSION

The Court should dismiss the amended complaint with prejudice.

- 21 -

February 20, 2013

/s/  David C. Giles
David C. Giles
Schiff Hardin LLP
233 S. Wacker Dr., Suite 6600
Chicago, IL 60606
T:  312-258-5500
F.  312-258-5600
*Attorneys for McGuireWoods LLP*

## **CERTIFICATE OF SERVICE**

I certify that on February 20, 2013 I filed the foregoing using the ECF system, which will send notice to all parties having appeared as of record.

/s/ David C. Giles
David C. Giles