**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| DAVID ABRAMS as Liquidating Trustee | ) | |
| of Heartland Memorial Hospital, LLC, and | ) | |
| HEARTLAND MEMORIAL HOSPITAL, LLC, | ) | |
| an Indiana limited liability company, | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No. 2:12-CV-021-PPS-PRC |
| | ) | |
| v. | ) | |
| | ) | |
| MCGUIREWOODS, LLP | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM, OPINION AND ORDER**

This is the bankruptcy trustee's fourth attempt to hold the law firm of

McGuireWoods liable for the events that led to Heartland Memorial Hospital, LLC's

bankruptcy. Heartland ran a hospital in Munster, Indiana before entering into

bankruptcy in 2007. Heartland claims the bankruptcy happened because its parent

company, iHealthcare, Inc., was bought out by a private equity firm, and the firm sold

real estate owned by Heartland to finance the deal. This transaction enriched the

iHealthcare board members, but left Heartland unable to pay its bills. McGuireWoods

served as iHealthcare's attorney during the sale.

Plaintiffs first tried to hold McGuireWoods liable for legal malpractice. As I'll

discuss later on, this effort has been unsuccessful, in part because McGuireWoods was

not Heartland's attorney. Now, in the Second Amended Complaint, Plaintiffs allege

that McGuireWoods is liable for aiding and abetting breach of fiduciary duty. (DE 53.)

The theory is that Heartland's managers breached their fiduciary duty to Heartland by allowing Heartland's assets to be sold off. Plaintiffs allege that McGuireWoods assisted the breach of fiduciary duty by drafting the documents for the transactions. McGuireWoods has filed a motion to dismiss for failure to state a claim, which is now ripe for disposition. (DE 67.)

For reasons that I'll discuss below, McGuireWoods' Motion to Dismiss (DE 67) is **GRANTED**, and the Second Amended Complaint is **DISMISSED.**

## Factual and Procedural Background

This suit is just one of a series of lawsuits arising out of very complicated bankruptcy proceedings involving Heartland and iHealthcare, Inc. Fortunately, it's not necessary to summarize the entire universe of the litigation in order to decide McGuireWoods's dismissal motion. Suffice it to say that litigation spawned from the bankruptcy of Heartland has been legion.

There are three parties to this lawsuit. The first plaintiff, Heartland Memorial Hospital, LLC, is an Indiana LLC that is currently in the midst of bankruptcy proceedings in this district. (DE 53 ¶ 1.) Heartland's co-plaintiff is its bankruptcy trustee, David Abrams, who was appointed to manage and represent Heartland in November 2008. (*Id*. ¶ 3.) For ease of reference and unless specificity is otherwise needed, I will refer to plaintiffs together as "Heartland." The defendant is McGuireWoods, a large international law firm with an office in Chicago, Illinois. (*Id*. ¶ 5.)

Heartland operated a hospital in Munster, Indiana. (*Id.* ¶ 1.) It was a wholly-owned subsidiary of iHealthcare, Inc., an Indiana corporation formed in 2002. (*Id.* ¶ 11.) From 2004 until 2006, Heartland was run by a management committee that consisted of the iHealthcare Board of Directors. (*Id.* ¶ 13.) Heartland began running into financial difficulty in the mid-2000s. By the summer of 2005, it was essentially insolvent. (*Id.* ¶ 18.) At that point iHealthcare board members began looking for an outside investor to help rescue their ailing subsidiary. They found one in Leroy Wright and his investment firm Wright Capital Partners, and began negotiating a buyout. (*Id.* ¶¶ 20-21.)

The talks culminated in a March 2006 deal that had Wright Capital buying iHealthcare. (*Id.* ¶ 25.) The deal was what is commonly referred to as a leveraged buy-out. (*Id.*) In a leveraged buyout, a buyer borrows money to acquire a company, and then uses the assets of the company as collateral for the loans the buyer took out to purchase the company. That is essentially what happened here. Wright Capital purchased iHealthcare from the iHealthcare shareholders for approximately $25 million. (*Id.* ¶ 25.) In order to finance the purchase, Wright Capital sold off some of iHealthcare's assets. In particular, Wright Capital sold real estate that was owned by iHealthcare's subsidiary, Heartland. (*Id.* ¶ 25.) The cash generated by the real estate sale was used to pay the iHealthcare shareholders. (*Id.*)

Wright Capital sold off Heartland's hospital building as part of the transaction, but Heartland obviously still needed a building in which to conduct its business. (*Id.* ¶¶ 26-28.) As a result, Wright Capital worked out a deal whereby Heartland would lease

the hospital building back from the new owners, albeit at a steep rate. (*Id.)* Heartland

refers to this as the "AIC/Leaseback transaction." (*Id.*)

Heartland argues that these two transactions — the sale of Heartland to Wright

Capital and the leaseback of the hospital — represented the "looting" of Heartland's

assets. The "looting" occurred, according to the complaint, when Heartland's assets

were sold, and the proceeds of the sale were used to pay off iHealthcare's selling

shareholders.  It is this "looting" that forms the basis of their claim against

McGuireWoods.  McGuireWoods represented iHealthcare in the buyout and performed

the legal work necessary to structure the deal between iHealthcare and Wright Capital.

(*Id.* ¶¶ 42-43.)  A different law firm, DLA Piper, represented Wright Capital in the

contemporaneous AIC/leaseback transaction.  McGuire Woods wasn't involved in that

transaction. (*Id.* ¶¶ 25-26, 47-48.)

In the end, the deals worked out very poorly for iHealthcare, Heartland, and, by

extension, Wright Capital.  Heartland could not reverse its financial deterioration, and,

less than a year later, both iHealthcare and Heartland entered bankruptcy proceedings

in this district's bankruptcy court. (*See In re Heartland Mem'l Hosp., LLC*, No.

07-20188-JPK (Bankr. N. D. Ind. Jan. 31, 2007), DE 1, 75; *In re iHealthcare, Inc.*, No.

07-20612-JPK (Bankr. N. D. Ind. Mar. 16, 2007), DE 1.)  As mentioned, the blow-up of

Heartland and iHealthcare has led to an enormous amount of litigation. The history of

the transaction and the founding of Heartland — as well as Heartland's ultimate demise

— was fully explained in my summary judgment opinion in the related case of *Yessenow v. Hudson et. al.*, 2:08 CV 353 PPS, Docket Entry 195.[1]

In November 2008, Heartland emerged from its bankruptcy as a reorganized debtor under a confirmed "Liquidating Plan of Reorganization." (*In re Heartland*, DE 2010.) That plan appointed David Abrams as Heartland's "Liquidating Trustee" and tasked him with selling Heartland's assets for the benefit of creditors. (*Id*. DE 1887-1 §§ 3.1, 6.2 and DE 1938 § 7.1.)

As part of the liquidation effort, Abrams, as liquidating trustee, filed suit in Illinois state court against McGuireWoods, DLA Piper (Wright Capital's attorney), and Harold Collins (iHealthcare's general counsel) alleging legal malpractice. (DE 14 Ex. 2.) The state court dismissed the suit on the ground that it should have been filed in the bankruptcy court. *(Id.* Ex. 3-5.)

Abrams and Heartland then filed malpractice suits in bankruptcy court. I withdrew the reference for this suit against McGuireWoods in February 2012. (DE 2.) In September 2012, I dismissed Heartland's complaint for failure to state a claim. (DE 21.) I held that the complaint did not allege facts sufficient to establish that there was ever an attorney-client relationship between McGuireWoods and Heartland. Plaintiffs filed the first amended complaint in October 2012 in an attempt to correct the defect. (DE 25.)

---

[1] Leroy Wright, the founding member of Wright Capital Partners, was the driving force behind the transaction that led to the formation of Heartland. Mr. Wright committed suicide in September 2010 after the investment in Heartland unraveled. *Id.* at 2 and n.1.

Meanwhile, Plaintiffs were pursuing a nearly identical malpractice claim against

DLA Piper (to repeat, Wright Capital's attorneys) in a parallel proceeding in front of

Judge Springmann. *See Abrams v. DLA Piper (US) LLP*, No. 2:12-cv-00019-TLS-APR.  In

June 2013, Judge Springmann rejected the plaintiffs' malpractice theory in that case.

*Abrams v. DLA Piper (US) LLP*, No. 2:12-cv-19-TLS, 2013 WL 2634767 (N.D. Ind. June 12,

2013).  Judge Springmann held that the plaintiffs failed to state a claim because they

essentially alleged that DLA Piper failed to give Heartland proper business advice,

which is not an actionable offense. *Id.* at *7.

Since Heartland's malpractice claim against McGuireWoods was basically the

same as the one that was rejected in the DLA Piper matter, Heartland asked this court

for leave to amend the complaint. (DE 51.)  I granted leave, but I noted that there were

troubling inconsistencies between the complaint against DLA Piper and the complaint

against McGuireWoods. (DE 52.)  Most notably, on the one hand, the complaint against

DLA Piper alleged that McGuireWoods had expressly denied ever representing

Heartland.  The complaint against McGuireWoods, on the other hand, omitted this

critical tidbit and argued that McGuireWoods knowingly represented Heartland. (*Id.* at

2-3.)  This factual inconsistency was of concern to me so I advised Plaintiffs to address

the omission in their new pleading.[2]

---

[2]Plaintiffs still allege that McGuireWoods represented Heartland.  They responded to
my concern about the inconsistency between pleadings by dropping the conflicting allegation
from the DLA Piper complaint. (DE 77 at 4.)  They argue that they had not meant to allege that
McGuireWoods had expressly denied that it represented Heartland in the first place, and any
impression to the contrary was the result of sloppy drafting. (*Id.*)

In July 2013, Plaintiffs filed the operative Second Amended Complaint. This time they wisely dropped the legal malpractice claim, and instead press an entirely different theory: that McGuireWoods is liable to Heartland for aiding and abetting breach of fiduciary duty. (DE 53.) McGuireWoods has again moved to dismiss for failure to state a claim upon which relief can be granted, and that is the motion that is presently before me. (DE 67.)

In the meantime, Heartland also filed a Fourth Amended Complaint in its case against DLA Piper before Judge Springmann. The complaint alleged the same theory as is now before me — aiding and abetting breach of fiduciary duty. Judge Springmann recently denied a motion to dismiss the claim. *See Abrams v. Heartland*, 2:12 CV 19 TLS, 2014 WL 3361802 (N.D. Ind. July 9, 2014). Although well-reasoned, Judge Springmann's decision will not much influence my decision as it was based on Illinois, rather than Indiana, law and DLA Piper is alleged to have played a much bigger role in the transaction than McGuireWoods. Moreover, a review of the briefing before Judge Springmann reveals that the arguments made by McGuireWoods in this case were not made to Judge Springmann by DLA Piper. *See Abrams v. Heartland*, 2:12 CV 19 TLS, DE 24, DE 29, DE 32 .

## DISCUSSION

In order to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *accord Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 555 (2007). I must accept

all factual allegations as true and draw all reasonable inferences in the complainant's

favor, but I don't need to accept threadbare legal conclusions supported by purely

conclusory statements. *See Iqbal*, 129 S.Ct. at 1949-50. The first step in my analysis is to

identify and disregard all allegations in the complaint that are not entitled to the

assumption of truth, especially including any legal conclusions. *Id.* at 1951. Then I

must look at the remaining allegations to determine whether they *plausibly* — and not

merely possibly or conceivably — suggest an entitlement to relief. *Id.* This task

invariably requires me to draw on my judicial experience and common sense. *Id.* at

1950.

### A.     Choice of Law

McGuireWoods makes several arguments in favor of dismissal, but the first thing

I have to get straight is which state's law governs Heartland's claim. Since this is a

diversity case, Indiana's choice of law rules determine the applicable state law. *See*

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (forum state's choice of law

rules determine the applicable law in diversity cases). Back when this was a

malpractice action, I had assumed that Illinois law would probably apply. That made

sense then. The general rule for torts is that the law of the state where the injury

occurred controls. That would be Illinois in a malpractice action because most of the

allegedly defective legal work was performed in McGuireWoods's Chicago office.

The new claim changes the calculus, however. It's still a tort claim, but it's a tort

that concerns a company's internal affairs. *In re Direct Response Media, Inc.* 466 B.R. 626,

646 (Bankr. D. Del. 2012) (noting that few claims are more central to a corporation's

internal affairs that those relating to alleged breaches of fiduciary duties by company's directors and officers). By this I mean that in order to prevail, Plaintiffs will first have to prove that Heartland's managers owed Heartland a fiduciary duty. And the existence of that duty depends upon Heartland's internal corporate structure. In cases involving the internal affairs of a corporation or LLC, Indiana applies the "internal affairs doctrine" to determine what state's law applies to the claim. *Nagy v. Riblet Prods. Corp.*, 79 F.3d 572, 576 (7th Cir. 1996). The internal affairs doctrine provides that the law of the state in which a company is incorporated or organized governs its internal affairs. *Nagy*, 79 F.3d at 576; *CDX Liquidating Trust v. Venrock Associates*, 640 F.3d 209, 212 (7th Cir. 2011). This is true even for aiding and abetting breach of fiduciary duty claims. *See, e.g.*, *Mukamal v. Bakes*, 378 F. App'x 890, 896-97, 902 (11th Cir. 2010) (applying the internal affairs doctrine to an aiding and abetting breach of fiduciary duty claim); *City of Harper Woods Employees' Ret. Sys. v. Olver*, 589 F.3d 1292, 1294-95 (D.C. Cir. 2009) (same). Heartland is an Indiana company, so Indiana law will govern the claim.

That leads to a basic question: does Indiana recognize aiding and abetting breach of fiduciary duty as a cause of action? The answer turns out to be no, or at least not yet. Heartland can point to no Indiana state decisions recognizing this sort of claim. Moreover, in a 2011 decision, the Indiana Appellate Court expressly declined to rule on whether Indiana had adopted aiding and abetting breach of fiduciary duty as a cause of action. *See DiMaggio v. Rosario*, 950 N.E.2d 1272, 1276 (Ind. Ct. App. 2011). In general,

district courts are encouraged to dismiss actions based on novel state law claims. *Railway Express Agency, Inc. v. Super Scale Models, Ltd.*, 934 F.2d 135, 138 (7th Cir. 1991).

On the other hand, there's compelling evidence that, even if it hasn't yet recognized the cause of action, the Indiana Supreme Court would do so. This is because, as the Seventh Circuit has observed, aiding and abetting liability is not a separate or independent tort, but rather a theory for holding a person liable who knowingly assists ("aids and abets" in legal parlance) a wrongdoer. *Heffernman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006). Indiana courts recognize liability for breach of fiduciary duty. *See, e.g., G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 238 (Ind. 2001). They also recognize aiding and abetting liability for torts in general. *See Pinkney v. Thomas*, 583, F. Supp. 2d 970, 978-79 (N.D. Ind. 2008) ("Indiana courts have adopted Section 876 of the Restatement (Second) of Torts concerning aiding and abetting . . . for both intentional torts and negligence actions."); *Hellums v. Raber*, 853 N.E.2d 143, 146-47 (Ind. Ct. App. 2006) (applying derivative liability rules to negligence claim).

Therefore, it will not represent a departure for Indiana court's to recognize aiding and abetting liability for the particular tort of breach of fiduciary duty. Indeed, there is some Indiana precedent, albeit with a thick layer of dust on it, that at least suggests Indiana does recognize liability for aiding and abetting another party's breach of fiduciary duty. *See Baker O'Neal Holdings, Inc. v. Ernst & Young LLP*, 1:03-cv-0132-DFH, 2004 WL 771230, at *12 (S.D. Ind. Mar. 24, 2004) (citing *Sharts v. Douglas*, 163 N.E. 109 (Ind. Ct. App. 1928). Therefore, despite the fact that there is no Indiana case

expressly recognizing liability for aiding and abetting breach of fiduciary duty, I think it likely that an Indiana court would allow this claim to go forward.

Though I have resolved the question of *whether* Indiana would recognize an aiding and abetting claim, I haven't yet resolved *how* they would recognize it - what standards they would use to evaluate the claim. This is a tougher questions, and the evidence is spottier. So, in evaluating Heartland's claim, I am going to keep the Seventh Circuit's repeated guidance in mind, and, when faced with opposing plausible interpretations of state law, I will choose the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability. *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 635-36 (7th Cir. 2007); *Home Valu, Inc. v. Pep Boys-Manny, Moe & Jack of Del., Inc.*, 213 F.3d 960, 963 (7th Cir. 2000); *Birchler v. Gehl Co.*, 88 F.3d 518, 521 (7th Cir. 1996).

### B.      Breach of Fiduciary Duty

Now that the preliminary matters are sorted out, I can finally get started on Heartland's claim. To state a cause of action for aiding and abetting breach of fiduciary duty, Heartland needs to allege that (1) the party whom McGuireWoods assisted breached a fiduciary duty owed to Heartland; (2) McGuireWoods knowingly and substantially assisted the breach; and (3) McGuireWoods was aware of its role when it provided the assistance. *Hefferman*, 467 F.3d at 601; Restatement (Second) of Torts § 876.

McGuireWoods argues that the complaint is deficient with respect to each and every element of the claim. Two arguments stand out: the Heartland can't plausibly

allege an underlying breach of fiduciary duty and Heartland has not alleged that

McGuireWoods substantially assisted the underlying breach. I'll have more to say on

the second issue soon, but first, I am going to concentrate on the allegations of an

underlying breach of fiduciary duty. This is the bedrock element of the claim. If

Heartland can't plausibly allege that the underlying breach of fiduciary duty occurred,

they cannot state an aiding and abetting claim against McGuireWoods. In other words,

if there wasn't a breach of a fiduciary duty to begin with, then there wasn't anything for

McGuireWoods to assist. And, as I'll explain, Heartland cannot plausibly allege that a

breach occurred.

Here's Heartland's story: some of Heartland's managers breached their fiduciary

duty to the company by allowing the Wright Capital buyout and AIC/leaseback

agreement to go forward. Or as Heartland puts it, certain "Heartland insiders"

breached their fiduciary duty to Heartland by "converting its assets to cash so they

could loot the company." (DE 53 ¶ 43.) The complaint is fuzzy on how exactly the

Heartland managers converted the property, given that it was *Wright Capital*, not

Heartland's managers, that actually sold the land. But before I get bogged down in the

details of the claim, I have to address a more a more fundamental question: did the

Heartland managers owe a fiduciary duty to Heartland in the first place?

The answer is no. Heartland was a wholly-owned subsidiary of iHealthcare. *(Id.*

¶ 11.) And the "insiders" managing Heartland were the Board of Directors of

iHealthcare. *(Id.* ¶¶ 13-15.) It is settled law that a parent corporation does not owe

fiduciary duties to its wholly-owned subsidiaries. *Trenwick America Litigation Trust v.*

*Ernst & Young, L.L.P.*, 906 A.2d 168, 191 (Del. Ch. 2006); *L.R. Schmaus Co. v. C.I.R.*, 406 F.2d 1044, 1045 (7th Cir. 1969) ("If an officer of the company owns all the stock he may use the corporate assets as he sees fit . . ."). Nor does a manager or director of a wholly-owned subsidiary owe a fiduciary duty to the subsidiary. Rather, the duty is owed to the parent corporation. *Trenwick*, 906 A.2d at 200. *See also* 3 Fletcher Cyc. Corp. § 844.30. ("In a parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."); *accord* 19 C.J.S. Corporations § 562.

This is sensible because corporations have a legal responsibility to manage their business for the benefit of their shareholders. *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 635 (3d Cir. 2007); *North American Catholic Educ. Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007). In the wholly-owned subsidiary context, however, there is only one shareholder — the parent corporation. The manager of the wholly-owned subsidiary, then, is obligated to act for the good of the parent company. There's no reason to consider the subsidiary's interest apart from the parent's, as, by definition, what's good for the parent is good for the subsidiary. *See* 3 Fletcher Cyc. Corp. § 844.30 ("A wholly owned subsidiary has only one shareholder, the parent corporation, so there is only one interest to be protected and hence no opportunity for divided loyalties."); *VFB LLC*, 482 F.3d at 635 ("Directors must act in the best interests of a corporation's shareholders, but a wholly-owned subsidiary has only one shareholder: the parent. There is only one substantive interest to be protected and hence 'no divided

loyalty' of the subsidiary's directors . . ."). Or, putting it another way, wholly-owned

subsidiaries are expected to operate for the benefit of their parent corporations; that is

why they are created. *Trenwick*, 906 A.2d at 193.

This is true even if the parent asks the wholly-owned subsidiary to take an action

that would reduce the subsidiary's value as a stand-alone enterprise, such as paying a

dividend to the parent corporation. *Id.* at 202. Wholly-owned subsidiaries are formed

by the parents to benefit the parents and not for their own sake. *Id.*

Not so fast, says Heartland. They argue that there is an important exception to

this rule that applies when the wholly-owned subsidiary is insolvent or where the

transaction at issue would render the subsidiary insolvent. *See Seidel v. Byron*, 405 B.R.

277, 285 (N.D. Ill. 2009). Under Delaware law, at least, when a wholly-owned

subsidiary is insolvent, the officers and directors of that subsidiary owe fiduciary duties

to that subsidiary and its creditors. *In re Scott Acquisition Corp.*, 344 B.R. 283, 286 (Bankr.

D. Del. 2012). Or, as one court put it, once a subsidiary is insolvent, "the directors . . .

cannot allow the subsidiary to be plundered for the parent company's benefit." *In re

Direct Response Media*, 466 B.R. 626, 649 (Bankr. D. Del. 2012). Heartland argues that the

exception applies here.

The problem for Heartland is that this exception is based on a premise that has

been explicitly rejected in Indiana. Delaware law holds that, when a wholly-owned

subsidiary becomes insolvent, the subsidiary's director has an obligation to protect the

company's assets for the company's creditors. As the Delaware Supreme Court

explained: "when a corporation is insolvent . . . its creditors take the place of the

shareholders as the residual beneficiaries of any increase in value . . .[and] the corporation's insolvency makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value." *Gheewalla*, 930 A.2d at 101-02. This waning of the shareholders' interest in the corporation and waxing of the creditor's interest is said to justify imposing fiduciary obligations on directors and managers towards the company's creditors. *Id.; Production Resources Group, LLC v. NCT Group, Inc.*, 863 A.2d 772, 791 (Del. Ch. 2004). This principle is sometimes called the "trust fund theory" as the director becomes a kind of trustee tasked with preserving capital for the benefit of creditors. *Production Resources*, 863 A.2d at 791.

Indiana, though, has completely rejected the trust fund theory. *Geiger & Peters, Inc. v. Berghoff*, 854 N.E.2d 842, 850 (Ind. Ct. App. 2006) ("Indiana does not adhere to the "trust fund" theory that insolvent manufacturing corporations . . . hold their property in trust for their creditors"). Instead, under Indiana law, the duty of a subsidiary's directors and officers always runs to the corporation and its stockholders, and never to the creditors. *Id.* (citing *Nappanee Canning Co. v. Reid, Murdock & Co.*, 64 N.E. 870, 872 (Ind. 1902)). Without the trust fund theory exception, we are back where we started: insolvent or not, Heartland's managers owed their fiduciary duty to iHealthcare, not Heartland.

Heartland attempts to argue that the trust fund theory is a red herring. They claim that the manager of an insolvent subsidiary has a duty to the subsidiary itself that is separate and distinct from any duty to the subsidiary's creditors. This argument

doesn't work. First, Heartland has not come forward with a single case that doesn't also

involve a fiduciary duty to a company's creditors. Each case that discusses a fiduciary

duty owed to a wholly-owned subsidiary discusses the duty in connection with the

corresponding duty to the subsidiary's creditors. *See, e.g.*, *In re Direct Response Media*,

466 B.R. at 650 ("The director defendants . . . owed fiduciary duties to the subsidiary's

creditors once it became insolvent."). So if courts are imposing such a duty on insolvent

subsidiaries separate and apart from the duty to creditors, I haven't seen it, and, more

importantly, have seen no indication that Indiana would recognize it.

Moreover, the idea of a manager's duty to the insolvent subsidiary without a

corresponding duty to its creditors is incoherent. The only reasons that insolvency

matters is that it sets up a potential conflict between what's best for the subsidiary's

shareholder and what's best for the subsidiary's creditors. In a solvent corporation the

wholly-owned subsidiary has only one interest to serve — that of the parent

corporation. Insolvency creates another potential interest group — the company's

creditors. Delaware law makes the potential conflict an actual one, as it mandates that

the director of the insolvent subsidiary take the creditor's interest into account when

making decisions. *Production Resources*, 863 A.2d at 792 ("When a firm has reached the

point of insolvency . . . the firm's directors are said to owe fiduciary duties to the

company's creditors."). This, in turn, sets up a conflict between what's in the best

interest of the parent (ignoring the creditors) and what's in the best interest of the

subsidiary (balancing between creditors and the parent corporation). *In re Scott*, 344

B.R. at 287 (the manager of an insolvent subsidiary "must be acutely sensitive to the

-16-

needs of a corporation's separate communities of interest, including both the parent

shareholder and the corporation's creditors. ") (quoting *RSL COM PRIMECALL, Inc. v.*

*Beckoff*, 01-11457, 2003 WL 22989669, at *12-13 (Bankr. S.D.N.Y. Dec. 11, 2003)).  It is in

this sense that the managers owe a fiduciary duty to the insolvent subsidiary: they have

a duty to ensure that the subsidiary breaks with the parent corporation to the extent

necessary to protect the interest of creditors. *VFB LLC*, 482 F.3d at 635 (noting that a

duty of loyalty against the parent corporation arises when the subsidiary represents a

minority interest in addition to the parent such as when the subsidiary is insolvent and

the creditor's investment is at risk.).

Without a duty to the creditors, the conflict between the wholly-owned

subsidiary and the parent corporation disappears.  Insolvency no longer creates a

"community of interest" that the beleaguered manager has to try to keep in balance.

There remains one, undivided, interest — that of the shareholder parent.  Whether a

company is insolvent or not, the manager's duty remains "managing the affairs of the

subsidiary in the best interest of the parent and its shareholders." *Trenwick*, 906 A.2d at

200.

That is the case here.  Indiana law does not impose any fiduciary duties to

creditors, so Heartland's insolvency did not change its relationship with iHealthcare.

As a wholly-owned subsidiary, it continued to operate for the benefit of iHealthcare.  Its

managers continued to have an obligation to manage Heartland in a manner that

benefitted iHealthcare, even if, as it happened, it hurt Heartland as a stand-alone

enterprise. Since the Heartland managers did not owe a fiduciary duty to Heartland, Heartland has not pled a plausible claim for aiding and abetting breach of fiduciary duty.

### C. Substantial Assistance

There's a another, simpler problem with the claim. There is no allegation that McGuireWoods did anything more than provide routine legal services. In order to state a claim, Heartland has to plausibly claim that McGuireWoods "substantially assisted" the Heartland insiders in breaching their fiduciary duty. *Hefferman*, 467 at 601. The assistance must be active and direct, rather than passive and indirect. *See Premier Capital Mgmt., LLC v. Cohen*, 02 C 5368, 2008 WL 4378313, at *6 (N.D. Ill. Mar. 24, 2008) (allegations of passive and indirect participation are not enough to sustain an aiding and abetting breach of fiduciary duty claim). In other words, the defendant has to have actually *done something* to help, and not just helped by failing to prevent the breach. *Varga v. U.S. Bank Nat. Ass'n*, 952 F. Supp. 2d 850, 860-61 (D. Minn. 2013) (liability must be based on affirmative acts, not acts that should have been taken).

Most importantly for this case, the general rule is that, in cases involving business professionals like lawyers, substantial assistance "means something more than the provision of routine professional services." *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 643 (2d Cir. 2012). *See also Schatz v. Rosenberg*, 943 F.2d 485, 497 (4th Cir. 1997) (no aiding and abetting liability when law firm merely "papered the deal" or acted as a scrivener); *Chem-Age Indus., Inc. v. Glover*, 652 N.W.2d 756, 774-75 (S.D. 2002) *(*same).

If the law were otherwise, it would be nearly impossible for an attorney, no matter how scrupulous, to avoid liability for a client's misdeeds. *See, e.g.*, *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 189 (Minn. 1999) ("if we were to recognize that [routine accounting services] constitute substantial assistance, it would be the rare accountant indeed who would not be subject to automatic liability merely because his client happens to be a tortfeasor"). It is true that some jurisdictions dissent from this rule. California courts, for instance, have held that ordinary business transactions can constitute substantially assistance so long as the aider and abettor knows the services will help their client commit the breach. *Casey v. U.S. National Bank Ass'n,* 26 Cal. Rptr. 3d 401, 406 (Cal. Ct. App. 2005). But, since this issue is undecided under Indiana law, I'm going to choose the interpretation of "substantial assistance" that restricts liability, rather than an expansive interpretation that would create more liability. *Pisciotta*, 499 F.3d at 635-36 (7th Cir. 2007).

Heartland's allegations of substantial assistance fail on both accounts. First, several allegations just allege McGuireWoods's passive assistance. The complaint alleges McGuireWoods substantially assisted Heartland by "failing to take any steps" to ensure Heartland received business advice, "never advis[ing]" Heartland's selling shareholders "that they were breaching their fiduciary duties" and not "tak[ing] any steps to protect Heartland" against the selling shareholder's actions. (DE 53 ¶ 43.) Without more, McGuireWoods's inaction does not constitute substantial assistance. *See, e.g., El Camino Res., LTD v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 914 (W.D. Mich.

2002) ("Silence, inaction, or failure to investigate does not constitute substantial assistance."); *Varga*, 952 F. Supp. 2d at 861 ("[k]nowledge of a violation combined with inaction, does not constitute substantial assistance.") (citing *Bedford v. City of Minneapolis*, 2012 WL 6200365, at *6 (D. Minn. Dec. 12, 2012).

Finally, Heartland doesn't allege that McGuireWoods did anything other than provide ordinary legal services. According to the Complaint, McGuireWoods "performed the legal work necessary to structure and document the Wright Capital merger" and, "provid[ed] the legal services necessary to negotiate and document the Wright Capital merger." (DE 53 ¶¶ 42-43.) This is just two (slightly) different ways of saying the same thing: McGuireWoods papered the merger deal. They performed the ordinary, run-of-the mill legal grunt-work necessary in any complicated transaction. And that is just not enough to serve as a basis for liability. *See Schatz*, 943 F.2d at 497 (holding that a law firm could not be liable for aiding and abetting a client's fraudulent activities when it merely "papered the deal").

## CONCLUSION

For the foregoing reasons, McGuireWoods' Motion to Dismiss is **GRANTED**, and Plaintiffs' Complaint is **DISMISSED.**

**SO ORDERED**.

ENTERED: July 25, 2014.

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
